**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DONRUDY LOISEAU, QUINTON L. HEBRON, and DWAYNE SMALL, individually and on behalf of all others similarly situated,<br>        Plaintiffs, | :<br>:<br>:<br>:<br>:<br>: | CIVIL CASE NO.<br>3:22-CV-01485(JCH) |
| v. | :<br>: | |
| BOZZUTO'S INC., JAMES JONES, CHUCK CERRETA, and JOEL SANTIAGO,<br>        Defendants, | :<br>:<br>:<br>:<br>:<br>: | FEBRUARY 21, 2025 |

**RULING ON MOTION TO CERTIFY CLASS (DOC. NO. 87)**

Contents:

I.   INTRODUCTION ........................................................................................... 3
II.  BACKGROUND ............................................................................................ 4
    A.  Factual Background .............................................................................. 4
        1.  Bozzuto's Company Overview .......................................................... 4
        2.  Individual Experiences of the Named Plaintiffs ................................. 11
    B.  Procedural Background ......................................................................... 17
III. LEGAL STANDARD ..................................................................................... 19
IV.  DISCUSSION .............................................................................................. 22
    A.  Rule 23(a) ........................................................................................... 24
        1.  Numerosity ..................................................................................... 24
        2.  Commonality ................................................................................... 24
            a. Disparate Impact ........................................................................25
                i. Applicable Law.........................................................................28
                ii. Bozzuto's Performance Review Practices.............................31
                iii. Bozzuto's Bid Policy..............................................................34
                iv. Promotions to Lead, Supervisor, and Manager.....................37
            b. Disparate Treatment....................................................................39
            c. Hostile Work Environment............................................................43
        3.  Typicality ........................................................................................ 47
        4.  Adequacy ....................................................................................... 50
        5.  Ascertainability ............................................................................... 52
    B.  Rule 23(b)(2)....................................................................................... 53
    C.  Rule 23(b)(3) ..................................................................................... 55

      1.   Predominance ................................................................... 55

      2.   Superiority ........................................................................ 60

    D.   Modifications to the Class Definition................................... 61

    E.   Rule 23(g) Appointment of Class Counsel ............................ 62

  V.  CONCLUSION .............................................................................. 63

I.      INTRODUCTION

Plaintiffs Don-Rudy Loiseau ("Mr. Loiseau"), Quinton L. Hebron ("Mr. Hebron"), and Dwayne Small ("Mr. Small") (together, "the plaintiffs"), bring this putative class action against their former employer, Bozzuto's Inc. ("Bozzuto's").[1]  See Amended Complaint ("Am. Compl.") (Doc. No. 49).  The plaintiffs, who are black, bring claims under section 1981 of Title 42 of the U.S. Code ("section 1981"), and Title VII of the Civil Rights Act, Section 2000 of Title 42, et seq. ("Title VII"), alleging that Bozzuto's discriminates against black employees with respect to pay, work assignments, promotions, workplace discipline, and terminations, and that Bozzuto's subjects black employees to a hostile work environment.  See generally, id.  The plaintiffs seek class-wide injunctive relief, compensatory damages, and punitive damages.  See id.

Before the court is the plaintiffs' Motion for Class Certification, pursuant to Rules 23(b)(2), 23(b)(3), or, in the alternative, 23(c)(4).  See Plaintiffs' Motion to Certify Class ("Pl.'s Mot.") (Doc. No. 87); see Plaintiffs' Memorandum of Law in Support of Plaintiffs Motion for Class Certification with Modified Redactions ("Pl.'s Mem") (Doc. No. 136-1).  The plaintiffs' Motion seeks certification of the following class:

> "All Black employees who worked within Bozzuto's wholesale operations
> in Connecticut between November 21, 2018 and the date of class
> certification who never held nor were promoted to Lead, Supervisor,
> Manager, Coordinator, Vice President, or Director roles."

Pl.'s Mot. at 3.  At oral argument, however, plaintiffs' counsel modified their class

---

[1] The plaintiffs also bring claims against three individual supervisors at Bozzuto's.  At oral argument, plaintiff's counsel clarified that the plaintiffs are not seeking class certification with respect to any individual-defendant claims.  See Transcript of Oral Argument ("Transcript") at 29:5-15.  As a result of this concession, the court will not refer to plural "defendants" in this Motion, but instead refer to "Bozzuto's" as a sole defendant to classwide claims.  Further, the court deems the Motion for Class Certification, to the extent it sought to certify a class against the individual defendants, withdrawn.

definition to include the supervisory positions of Lead, Supervisor, Manager,

Coordinator, Vice President, and Director.  See Transcript (Doc. No. 155) at 8:10-9:11.

Thus, the plaintiffs' class definition, as proposed at oral argument, reads:

> "All Black employees who worked within Bozzuto's wholesale operations
> in Connecticut between November 21, 2018 and the date of class
> certification."

Pl.'s Mot. at 3; Transcript at 8:10-9:11.  Bozzuto's opposes the Motion.  See

Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class

Certification ("Def.'s Mem.") (Doc. No. 89).

For the reasons stated below, the Motion is granted in part and denied in part,

subject to modifications to the proposed class definition.

## II.   BACKGROUND

A.   Factual Background

1.   Bozzuto's Company Overview

Bozzuto's is a wholesale distributor of food and household products based in

Connecticut.  See Def.'s Ex. 2, Declaration of Douglas S. Vaughan ("Vaughan Decl.") at

¶ 3.  Bozzuto's has three warehouse facilities: one in North Haven, Connecticut, and

two in Cheshire, Connecticut.  See id. at ¶ 7.  At Bozzuto's warehouse facilities,

employees assemble orders of food and other goods and ship them to retailers

predominantly in New England and the Mid-Atlantic.  See id. at ¶ 3.  In addition to its

three warehouse facilities, Bozzuto's has a corporate office in Cheshire, Connecticut,

and an additional facility in Cheshire for tractor and trailer repairs.  See id. at ¶ 7.  At any

given time, Bozzuto's employs between 250 and 300 employees in its North Haven

warehouse facility, and 1,400 employees across its Cheshire facilities.  See id.

In its warehouse facilities, Bozzuto's employs workers in a variety of hourly "associate" positions, including "selector," "forklift operator," "checker," "loader," "wrapper," "clerk," "pallet auditor," and others.  See id; Pl.'s Ex. 1, Expert Report of David M. Lang ("Lang Report") at Tbl. 6; see Pl.'s Ex. 7 at 1 (referring to "associate" positions).  Each of these positions is paid a base hourly rate, which varies by position.  See Def.'s Ex. 36.  An associate's hourly pay can increase until they reach the "top rate" for a given position.  See id; See Pl.'s Ex. 2, Def.'s Ex. 10 ("Peet Dep.") at 106:20-107:1.  In addition to hourly pay, warehouse associates can receive additional incentive compensation in the form of incentive pay, overtime pay, and premiums for working certain shifts, among other forms of incentive pay.[2]  See Def.'s Ex. 1, Expert Report of Carole M. Amidon-Johansson ("Amidon-Johansson Report") at 25.

In addition to increasing their hourly rate, warehouse associates can submit a "bid" to move from one associate role to another.  "Bids" are governed by a written Bozzuto's policy called the "Hourly Bid Policy and Procedure."  See Pl.'s Ex. 7 ("Bid Policy").  Bozzuto's considers movement between different associate positions to be lateral moves, not promotions, even though the hourly rate of pay can vary between positions.  See Peet Dep. at 218:2-8.

Warehouse associates are supervised by warehouse managers who have titles that include, in increasing order of seniority, "lead," "supervisor" and "manager."  See

---

[2] The record contains sparse information about these forms of additional pay and how they are determined.  The plaintiffs argue that the record is incomplete because defendants were late to produce information about incentive pay, despite earlier discovery requests for gross pay data and policies that govern incentive pay.  See Plaintiff's Second Motion for Sanctions (Doc. No. 150).  The defendants production of gross pay data has been the subject of two motions for sanctions, one of which remains pending.  See id.  The court is not deciding these motions here and, for reasons explained infra, will resolve the motion for class certification despite the incomplete record on incentive pay.

Pl.'s Ex. 1 Tbl. 5.  These "manager" and "supervisor" roles are salaried, while the "lead" role can either be hourly or salaried.  <u>See</u> Peet Dep. at 124:15-18; <u>see</u> Pl.'s Ex. 13 ("Cerreta Dep.") at 51:4-6.  Bozzuto's considers movement from a warehouse associate position into one of these roles to be a promotion.  <u>See</u> Peet Dep. at 197:14-18. Outside of its warehouse positions, Bozzuto's also employs a staff for a variety of other positions and functions, including various office and administrative roles, procurement staff, truck drivers, and security staff.  <u>See</u> Vaughan Decl. at ¶ 7.

The plaintiffs allege that Bozzuto's fosters a culture of systemic discrimination against black employees.  <u>See generally</u>, Am. Compl. The plaintiffs allege that Bozzuto's relegates black employees to the lowest paid and least desirable positions, while white employees can advance out of those positions.  <u>See</u> Pl.'s Mem. at 1, 5.  The plaintiffs also allege that Bozzuto's pays black associates less compared to similarly-situated white employees, and that Bozzuto's discriminates against black employees with respect to workplace discipline and promotions into management.  <u>See</u> id.  The plaintiffs also allege that Bozzuto's system of performance reviews, Hourly Bid Policy and Procedure, and promotions practices have a disparate impact on black employees.  <u>Id.</u>

a.    Bozzuto's Performance Review Practices

Bozzuto's has a standard procedure for determining the base hourly pay of warehouse associates.  The procedure is based on performance reviews that take place every six months from an associate's date of hire.  <u>See</u> Def.'s Ex. 36.  Warehouse associate positions begin at starting base pay rate.  <u>See</u> <u>id.</u> (listing, in 2020, an hourly "base/starting rate" of $15.00 for the selector position, $15.50 for the forklift operator position, and $18.00 for the "loader" position).  Full-time warehouse associates receive

a performance review every six months, which can incrementally increase their hourly pay up to a "top rate" for each position.  See id. (listing the "top rate[s]" for selector, forklift operator, and loader as $20.11, $20.61, and $23.11, respectively).  Once they reach the "top rate" for a given position, their performance review occurs annually.  Peet Dep. at 205:8-14.

Six-month performance reviews are conducted on a quantitative scale, where a points-based system is used to determine a "review score" and a "performance score."  See Def.'s Ex. 36.  Either score, if high enough, can result in a raise.  See id.  A "performance score" is based on meeting a certain threshold of productivity, which is measured as a percentage of expected productivity.  See id.  An associate could exceed their expected productivity, for example, by assembling an order expected to take them 30 minutes in only 20 minutes.  See Peet. Dep. at 215:4-8.  In order to obtain a raise based on productivity, a warehouse associate must have a "productivity" score of at least 95 percent.  See Def.'s Ex. 36.

Likewise, an associate's "review score" is generated based on quantitative metrics, by combining "quality," "attendance," and "safety" points.  See Pl.'s Ex. 37 ("Hebron Performance Review") at 1-2.  A "quality" score is based on the quality of products an associate picks for orders, and takes into account "mis-picks, overages, and shortages."  See id.; See also Peet Dep. at 212:20-213:2.  "Safety" and "attendance" scores are based on an associate's disciplinary record during the six-month evaluation period.  Associates start with perfect "safety" and "attendance" scores, and their scores decrease when they receive write-ups, or "corrective reviews," for safety or attendance issues.  See, e.g., Hebron Performance Review at 1.  For

example, when associates are involved in a preventable accident, such as crashing a cart, they may receive negative "safety points," which are later deducted from their "safety score," or if they arrives late, or have an "unexcused absence," they may accrue "attendance points" that are deducted from their attendance score.  See Hebron Performance Review at 1.  If an associate has enough points deducted from their "safety" and "attendance" scores, their "review score" will be too low to receive a raise.  See, e.g., id.; see Def.'s Ex. 36.

Outside of warehouse production jobs, Bozzuto's performance reviews are not always conducted at the same intervals or with similar performance metrics.  Some hourly, non-warehouse positions are reviewed every 90 days, for example.  See Peet Dep. at 205:14-17.  Salaried employees receive their reviews annually, which are based on goals and competencies that vary by position.  See id. at 205:18-19, 206:22-207:4.

b.    Bozzuto's Bid Policy

Movement between warehouse associate positions is governed by the Bozzuto's Hourly Bid Policy and Procedure ("Bid Policy").  The Bid Policy applies only to hourly positions at Bozzuto's warehouses.  See Bid Policy at 1 (listing the applicable "[d]epartment" as "Warehouse / Production," and stating the purpose of the policy as giving "qualified WHSE [warehouse] hourly associates . . . the opportunity to apply or bid" for other positions); see also Peet Dep. at 201:12-14 ("the Bid Policy was just for warehouse positions").

Bozzuto's considers a move from one warehouse associate position to another to be a lateral move, not a promotion.  See id. at 218:2-8.  Bozzuto's acknowledges that these positions require different skillsets, and that some roles have higher range of base

8

pay.  See Peet Dep. at 198:10-17, 218:2-8.  For example, even though the 2020 starting

rate and "top rate" are $.50 higher per hour for a forklift operator than for a selector,

Bozzuto's does not consider a selector moving to the forklift operator position a

"promotion."  The plaintiffs, however, characterize the move from selector to other

warehouse positions as "advancement," because positions like forklift operator are

better paid and less physically demanding than the selector role.  See Pl.'s Mem. at 3,

5.

Movement between warehouse associate positions is governed by a written

policy called the "Hourly Bid Policy and Procedure."  See Pl.'s Ex. 7 ("Bid Policy").  The

Bid Policy governs only 'lateral' moves, not promotions to lead, supervisor, or manager

positions.  See id. at 1.  Under the Bid Policy, openings for hourly warehouse roles, or

"open bids," are posted in a public place in each warehouse, such as an atrium or time

clock.  See id.  Interested associates can submit their candidacy by calling a Bozzuto's

"bid hotline."  See id.

The policy lists qualifications necessary to be eligible for an open bid, including

(1) having worked in a warehouse production or support position for a minimum of six

months, (2) being able to fulfill the physical demands and equipment operation

requirements of the position, and (3) for forklift operator and loader positions, having

been a selector for a minimum of six months.  See id.  Additionally, having too many

negative safety and attendance points can render an applicant ineligible.  Id.

Bids are posted for "about a week," and once the deadline has passed, the

applicants can be tested or interviewed to see if they meet the minimum qualifications

for the job.  Id. at 2.  Peet Dep. at 174:7-8.  The Bid Policy then states that the bid will

be awarded to "the most qualified candidate based on his/her prior work experience and knowledge." Id. "If there are two (2) or more candidates with equal experience and knowledge, the candidate with the most time in Bozzuto's Inc. will be offered the position." Id. If the associate accepts the new position, they are locked into that position for a period of six months and are not able to bid on another position during that time. See id.

The plaintiffs have testified, and Bozzuto's concedes, that the Bid Policy is often not followed to the letter and that warehouse employees are frequently offered positions, or rotate between positions, without bidding on them. See Pl.s' Ex. 3, Def.'s Ex. 9 ("Hebron Dep.") at 85:1-2 ("Yes, you're supposed to go by the bid, but they also pick and chose who they want"); Peet Dep. at 96:20-97:6 (testifying that managers had discretion to move warehouse associates without going through the bid process).

c.    Bozzuto's Promotion Practices

The plaintiffs describe Bozzuto's promotion practices as a "tap on the shoulder" system, where managers have discretion to fill supervisory positions without a formal application process. See Pl.'s Mem. at 4. With the exception of the "lead" position, Bozzuto's witnesses testify that management positions are posted publicly and subject to an open application process. See Peet Dep. at 219:6-12.

Lead roles, which are junior to supervisors and managers, are not always salaried; they can be paid hourly. Cerreta Dep. at 51:3-5. The defendants conceded that lead positions are not usually advertised. See id. at 22:19 ("Leads tend not to be open jobs"). Instead, they are created at management's discretion for high performing warehouse associates. See id. at 23:1-7.

10

Bozzuto's claims that manager and supervisor position are advertised publicly, both on Bozzuto's internal human resources website, on Bozzuto's public website, sometimes on third party sites like LinkedIn or Indeed, and sometimes physically in warehouses.  See Def.'s Ex. 11 ("Infante Dep.") at 19:5-9; Cerreta Dep. at 32:14-33:6 (testifying that, to his knowledge, supervisor positions were posted in the North Haven warehouse).

Both current employees and external applicants can apply to these postings, and roughly half of the positions are filled by current employees, the other half from external candidates.  Peet Dep. at 124:5-8.  While external candidates have to submit applications to these postings, current employees often can submit their names for consideration just by alerting a supervisor or human resources, because their former applications and resumes are already on file with the company. Cerreta Dep. at 33:7-34:3.  The plaintiffs and defendants agree that Bozzuto's does not always follow the procedure of posting supervisory positions, and the plaintiffs cite several examples of promotions they claim took place "by appointment."[3]  See Pl.'s Mem. at 7.

2.    Individual Experiences of the Named Plaintiffs

a. Don-Rudy Loiseau

Mr. Loiseau was hired by Bozzuto's as a selector in May of 2020.  See Vaughan Decl. at ¶ 7(d); see also Pl's Ex. 44.  Mr. Loiseau worked at Bozzuto's North Haven facility for his entire time at Bozzuto's.  In August of 2020, Mr. Loiseau moved from a

---

[3] Having reviewed testimony concerning several of these examples, it is not clear to the court that there was no application process in each case the plaintiffs cite. For example, Mr. Cerreta testified that, because he was a current employee, he did not have to send an application to be considered for the role of inventory control supervisor, but said he learned about it because his supervisor told him "an opening . . . was being posted."  Cerreta Dep. at 13:7-12.

selector position to a position as a product integrity clerk.  See id.  In December of 2020,

Mr. Loiseau submitted two bids for forklift operator positions, but was denied both

positions.  See Pl.'s Ex. 8 (Doc. No. 86-5).  Bid documents say that he was ineligible for

the forklift operator position because of his recent job transfer to product integrity clerk.

See id. at 4.  In February of 2021, Mr. Loiseau's supervisor offered him a role in quality

control without bidding.  See Pl.'s Ex. 23 ("Loiseau Dep.") at 127:11-25.  He accepted

the position, which he held until his resignation date.  See Vaughan Decl. at ¶ 7(d).

When Mr. Loiseau began working at Bozzuto's, his base hourly pay was $15.50 per

hour, it increased to $16.10 per hour in November 2020, then to $16.50 per hour in

February 2021.  See Vaughan Decl. at ¶ 7(d); see Pl.'s Ex. 44.

On June 18, 2021, Mr. Loiseau alleges that a white coworker was speeding down

the aisle of the warehouse floor on a center rider and crashed into the pallet that Mr.

Loiseau had on his forklift.[4]  See Pl.'s Ex. 22; Pl.'s Ex. 23, Def.'s Ex. 7 ("Loiseau Dep.")

at 197:21-25 at ¶ 68.  After the crash, Mr. Loiseau claims that the coworker, who is

white, spit on his forklift and called him a "f*****g n****r."  See Loiseau Dep. at 198:12-

19.  Mr. Loiseau reported the incident to a supervisor, Joel Santiago, and then to human

resources in an email.  See Loiseau Dep. at 198:22-23, Pl.'s Ex. 22.  The employee

denied using a racial slur.  See Pl.'s Ex. 45 ("HR Investigation") at 3.  Bozzuto's human

resources department conducted an investigation, which confirmed by surveillance

video that Mr. Loiseau's pallet "did in fact get clipped" and that there was a verbal

altercation with Mr. Loiseau and the employee both "were throwing their hands in the

---

[4] Although Mr. Loiseau was never held the position as a forklift operator, he sometimes used a
forklift in the course of his quality control duties.  See Def.'s Ex. 7 ("Loiseau Dep.") (Doc. No. 89-7) at
167:1-14.

air." See HR Investigation at 4.  However, the investigation could not corroborate the

coworker's use of a slur because the surveillance footage did not have accompanying

audio.  See id.  The coworker was not punished for the incident, and he was promoted

to supervisor seven months later.  See Pl.'s Ex. 20.

　　　　After this incident Mr. Loiseau alleges that management retaliated against him for

reporting the incident.  After missing work for a July 8, 2021 doctor's appointment, Mr.

Loiseau testified that his supervisor, Mr. Cerreta, falsely accused of him of a "no call/no

show," even though Mr. Loiseau had called a Bozzuto's hotline to alert them of his

appointment.  See Loiseau Dep. at 191:1-193:1.  Mr. Cerreta eventually ripped up the

disciplinary paperwork for the "no-call/no show" after Mr. Loiseau showed him the caller

ID from his phone, but still issued him a "corrective review" and an attendance point for

his unscheduled absence.  See Pl.'s Ex. 42 at 3.  Mr. Loiseau claims that, under

pressure to sign the disciplinary paperwork, he chose to resign instead.  See id. at 6.

　　　　In his resignation email later that day, Mr. Loiseau claimed that he had been

"reprimanded for contacting HR" by Mr. Jones.  See id. at 5 .  His resignation email also

states that, after the human resources investigation, he was called a "snitch," "douche

bag," and given the middle finger by coworkers.  Id.

　　　　In internal email to other supervisors responding to Mr. Loiseau's resignation

email, Mr. Cerreta disputed that Mr. Loiseau had been reprimanded for contacting HR.

See id. at 1.  Bozzuto's claims, and Mr. Loiseau conceded in his deposition, that no one

at Bozzuto's asked Mr. Loiseau to resign or told him that, if he didn't resign, he would be

fired.  See Loiseau Dep. at 196:14-24.

b.      Quinton Hebron

Mr. Hebron worked for Bozzuto's on two occasions: from May 15, 2017 to March 11, 2020, then again from September 20, 2020 to August 9, 2021.  See Vaughan Decl. at ¶ 7(a).  During both of these periods, he worked in the North Haven facility.  See id. Mr. Hebron was hired in 2017 as a selector, but became a pallet return clerk after approximately a year.  Hebron Dep. at 50:16-18; 57:10-16; 61:10-12.  Employment records show that, as a pallet clerk, Hebron made between $14.25 and $14.83 per hour. See Pl.'s Ex. 49.

Mr. Hebron received a variety of written warnings from his supervisors, at one point accumulating 10 negative "attendance points" within a 12-month period.  See Def.'s Ex. 25 at 11.  Attendance points prevented Mr. Hebron from earning a raise on at least one occasion.  See Hebron Performance Review.  Hebron alleges that, during his time at Bozzuto's, he was underpaid compared to his white colleagues, so much so that he once refused a $.56 per-hour raise on principle.  See Hebron Dep. at 74:16-75:6 ("[w]ho wants 56 cents when you work harder than everybody else in there . . . I deserved more than that").

Mr. Hebron testified that he approached his supervisor, Mr. Cerreta, about a position as a forklift operator, because the position paid better.  See Hebron Dep. at 79:21-80:5.  Mr. Hebron testified that it took "a lot of begging," but management eventually gave him a position as a forklift operator in October of 2019.  Id.; Pl.'s Ex. 49. In his deposition, Mr. Hebron testified that he did not remember bidding for the position. See Hebron Dep. at 92:10-16 ("I don't remember bidding for this. I don't know if they put my name on here or if I did bid").  Mr. Hebron's employment record indicate that, after

14

he became a forklift operator, his base hourly pay was $16.50 per hour until he left Bozzuto's for the first time in March of 2020.  See Pl.'s Ex. 49.  Mr. Hebron said he left Bozzuto's for a job he believed would earn him more money, but later returned and was rehired in his same position in September of 2020.  See Hebron Dep. at 35:8-14; Pl.'s Ex. 49.

Two months after he returned in November 2020, Mr. Hebron received a raise that brought his base pay up to $17.50 per hour.  Mr. Hebron left Bozzuto's in August of 2021 to take a higher paid position at another company.  See Hebron Dep. at 35:1-14.

Mr. Hebron testified that, during his tenure at Bozzuto's, Mr. Jones and other employees would frequently tell racist jokes to black employees.  See Hebron Dep. at 163:9-15.  At one meeting of warehouse employees, Hebron claims that Mr. Jones told a black employee that the black employee reminded him of Caesar, an ape character in the "Planet of the Apes" movie franchise.  Hebron Dep. at 163:9-164:13.  Mr. Hebron also testified that he overheard Mr. Loiseau's coworker call him a "n****r" from the next aisle over.  Hebron Dep. at 124:24-125:1 ("Q: what did you hear? A: Telling him to get the F out of the way, you stupid N word").

c.    Dwayne Small

Mr. Small was hired by Bozzuto's in January of 2018, and worked as a selector for approximately three years.  See Vaughan Decl. at ¶ 7(a); see Pl.'s Ex. 52.  For the entire time that Mr. Small was employed by Bozzuto's, he worked at the North Haven facility.  Vaughan Decl. at ¶7(a).

Mr. Small testified at his deposition that, during his time as a selector, his supervisors frequently tasked him with work outside the scope of his job duties, causing

him to fail to meet his production quotas.  See Pl.'s Ex. 21 ("Small Dep.") at 63:21-64:6,

68:10-14.  In 2018, Mr. Small was issued six "corrective reviews" for failing to meet

required production numbers.  See Pl.'s Ex. 54.  Mr. Small claims that he was required

by his supervisor, Mr. Santiago, to sign the related disciplinary paperwork under threat

of termination.  Small Dep. at 64:18-65:3.  Throughout Mr. Small's time as a selector, his

employment records indicate that he received only one raise, from $16.50 per hour to

$16.80 per hour.  See Pl.'s Ex. 52.

In December of 2020, Mr. Small transitioned into a role as a product integrity

clerk.[5]  Mr. Small testified that, in that role, he worked 10-hour shifts in North Haven

facility's refrigerated "meat room," which was kept "between 30 to 32 degrees."  See

Small Dep. at 152:17-23; Pl.'s Ex. 18 ("Santiago Dep.") at 196:11-17.  Despite the cold

temperatures, employees in the meat room were not afforded additional breaks.  See

Cerreta Dep. at 139:5-6 ("there's no special breaks for the meat room").

Mr. Small's employment records indicate that, during his time as a product

integrity clerk, he received five raises for "merit" between June of 2021, and May of

2022, ultimately bringing his pay up to $19.80 per hour.  See Pl.'s Ex. 52.  However, he

also began to receive warnings from supervisors about taking extended unauthorized

breaks while he was clocked in.  See Small Dep., 131:16-18; Pl.'s Ex. 54.  Mr. Small

testified that, on August 8, 2020, he was fired for taking a break to warm up outside after

he had finished his work inside the meat room.  Small Dep. at 112:19-113:9.  Bozzuto's

claims that Mr. Small was terminated for "stealing company time" after taking a two-and-

a-half hour break, and that he had previously been suspended in April of that year for a

---

[5] The record does not indicate whether Mr. Small bid for this position.

similar incident.  <u>See</u> Def.'s Ex. 19.

B.    <u>Procedural Background</u>

Mr. Loiseau filed a class action Complaint against Bozzuto's on November 21,

2022.  <u>See</u> Complaint (Doc. No. 1-1).  The Complaint listed only Mr. Loiseau as a

plaintiff and only Bozzuto's as a defendant. The Complaint alleged six Counts: Counts

One through Three brought claims of disparate treatment, hostile work environment,

and retaliation against Bozzuto's, respectively, under section 1981.  <u>See</u> Complaint, ¶¶

63-80.  Counts Four through Six brought claims of disparate treatment, hostile work

environment, and retaliation under Title VII  <u>See id.</u> at ¶¶ 81-98.  All six Counts were

styled as class-wide claims.  <u>See generally,</u> Complaint.

After a status conference pursuant Federal Rules of Civil Procedure ("F.R. Civ.

P.") Rules 16 and 26 on February 13, 2023, the court <u>sua sponte</u> ordered Mr. Loiseau to

address concerns the court had related to his ability to adequately represent the class

as the sole named plaintiff, as well as concerns about the adequacy of his counsel.  <u>See</u>

Order (Doc. No. 21).

The plaintiffs filed their first Amended Complaint on March 15, 2023.  <u>See</u> First

Amended Complaint ("First Am. Compl.") (Doc. No. 23).  The First Amended Complaint

added Mr. Hebron and Mr. Small as plaintiffs and putative class representatives for

section 1981 disparate treatment and hostile work environment claims.  <u>See</u> First Am.

Compl.  The First Amended Complaint also added James Jones, Mr. Cerreta, and Mr.

Santiago as individual defendants.  <u>See id</u>.  The plaintiffs also retained additional

counsel.  <u>See</u> Notice of Appearance by Daniel Kotchen (Doc. No. 26).  After both parties

filed responses to the court's Order, the court issued an order that allowed class-wide

17

discovery to proceed.  <u>See</u> Scheduling Order Regarding Case Management Plan (Doc. No. 40).

On May 31, 2023, the plaintiffs moved to amend their Complaint a second time, after Mr. Hebron and Mr. Small each received a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC").  The plaintiffs' Motion sought to add Title VII claims on behalf of Mr. Hebron and Mr. Small, as well as a Title VII disparate impact claim on behalf of all three named plaintiffs.[6]  The court granted the Motion in part over the defendants' objection.[7]  <u>See</u> Ruling on Plaintiffs' Motion to Amend Complaint (Doc. No. 48).

The plaintiffs filed the present Motion for Class Certification on July 5, 2024.  <u>See</u> Pl.'s Mot.; <u>see</u> Pl.'s Mem.  Bozzuto's opposes the motion.  <u>See</u> Def.'s Mem.  The plaintiffs filed a Reply on September 12, 2024.  <u>See</u> Plaintiffs' Reply in Support of Their Motion for Class Certification ("Pl.'s Reply") (Doc. No. 100).

In their original class certification Motion, the plaintiffs proposed the following class definition:

> "All Black employees who worked within Bozzuto's wholesale operations in Connecticut between November 21, 2018 and the date of class certification who never held nor were promoted to Lead, Supervisor, Manager, Coordinator, Vice President, or Director roles."

Pl.'s Mot. at 3.  At oral argument, however, plaintiffs' counsel requested that the class definition be modified to include black employees in Lead, Supervisor,

---

[6] The Motion also sought leave to correct the spelling of Mr. Hebron's first name.

[7] The court held, however, that Mr. Hebron's Title VII claims are limited to a Title VII disparate treatment claim for the allegedly disparate pay that he received within the two years before he filed his EEOC charge in May 2023.

Manager, Coordinator, Vice President, and Director positions.  Transcript at 8:10-

9:11.  Thus, the class definition, as the plaintiffs have orally proposed it, reads:

> "All Black employees who worked within Bozzuto's wholesale operations
> in Connecticut between November 21, 2018 and the date of class
> certification."

See id.  Further, although all six Counts of the Amended Complaint are styled as

class claims, see Am. Compl., the plaintiffs' counsel clarified at oral argument

that the plaintiffs are not seeking class certification on Mr. Loiseau's retaliation

claims, or the plaintiffs' claims against their individual supervisors.  Transcript at

29:5-14, 35:17-36:3.  Thus, the plaintiffs seek class certification for (1) their

disparate impact claims against Bozzuto's under Title VII, (2) their disparate

treatment claims against Bozzuto's under section 1981 and Title VII, and (3) their

hostile work environment claims against Bozzuto's under section 1981 and Title

VII.

The plaintiffs seek to utilize the two-phase trial system laid out in Int'l Bhd.

of Teamsters v. United States, 431 U.S. 324, 361 (1977).  Under the Teamsters

framework, the parties would first litigate Bozzuto's classwide liability.  If liability is

established on a classwide basis, then a second phase commences to establish

the scope of individual relief to which each class member is entitled.  See Id.

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 23(a) contains four necessary "[p]rerequisites"

for class certification:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These prerequisites are referred to as "numerosity, commonality, typicality, and adequacy of representation." E.g., Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 568 U.S. 455, 460 (2013). Class certification is appropriate only if the court is satisfied, "after a rigorous analysis," that the proposed class meets each of these prerequisites. See Wal-Mart Stores v. Dukes, 564 U.S. 338, 350–51 (2011). Additionally, the Second Circuit has recognized "an implied requirement of ascertainability" in Rule 23, which requires that the class be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015).

In addition to satisfying these prerequisites, a class action must qualify under at least one of the subsections of Rule that define the types of class actions listed in Rule 23(b). Here, the plaintiffs seek certification of the class under Rules 23(b)(2) and 23(b)(3), or, in the alternative, pursuant to Rule 23(c)(4). To certify a class under Rule 23(b)(2), the plaintiffs must show, by a preponderance of the evidence, that:

> "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

Fed. R. Civ. P. 23(b)(2). In order to certify a class under Rule 23(b)(3), the court must find, by a preponderance of the evidence, that

> "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is

20

superior to other available methods for fairly and efficiently adjudicating
the controversy."

Fed. R. Civ. P. 23(b)(3).  Courts refer to these additional requirements as
"predominance" and "superiority."  See, e.g. Chen-Oster v. Goldman, Sachs & Co., 325
F.R.D. 55, 80 (S.D.N.Y. 2018).  Rule 23(b)(3) provides that the matters pertinent to
these findings include whether "(A) the class members' interests in individually
controlling the prosecution or defense of separate actions; (B) the extent and nature of
any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the
particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ.
P. 23(b)(3).

It is the plaintiffs' burden "to establish, by a preponderance of the evidence, that
its proposed class [meets] the requirements of Rule 23."  In re Vivendi, S.A. Sec. Litig.,
838 F.3d 223, 264 (2d Cir. 2016).  In determining whether a putative class meets the
requirements of Rule 23, the court must resolve any factual disputes and find any facts
relevant to this determination.  See In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24,
40 (2d Cir. 2006), decision clarified on denial of reh'g sub nom. In re Initial Pub. Offering
Sec. Litig., 483 F.3d 70 (2d Cir. 2007).  The court's obligation to make such
determination "is not lessened by overlap between a Rule 23 requirement and a merits
issue, even a merits issue that is identical with a Rule 23 requirement."  Id.  The
Supreme Court has recognized that, for an employment discrimination class, "proof of
commonality necessarily overlaps with [the plaintiffs'] merits contention that [an
employer] engages in a pattern or practice of discrimination."  Wal-Mart Stores, Inc. v.

Dukes, 564 U.S. 338, 352 (2011).

The Second Circuit grants trial courts substantial discretion in determining whether to grant class certification because of the Circuit's "longstanding view that the district court is often in the best position to assess the propriety of the class and has the ability, pursuant to Rule 23(c)(4)(B), to alter or modify the class, create subclasses, and decertify the class whenever warranted." In re Sumitomo Copper Litig., 262 F.3d 134, 139 (2d Cir. 2001).

## IV.    DISCUSSION

The plaintiffs moved to certify a class of "[a]ll Black employees who worked within Bozzuto's wholesale operations in Connecticut between November 21, 2018 and the date of class certification."[8]  Pl.'s Mot. at 3, Transcript at 8:10-9:11.  The plaintiffs seek class certification with respect to (1) their disparate impact claims under Title VII, (2) their disparate treatment claims under Title VII and section 1981, and (3) their hostile work environment claims under Title VII and section 1981.

At the outset, the court notes that there are no relevant differences between the substantive law of section 1981 and Title VII that would require the court, for the purposes of the present Motion, to discuss the two causes of action separately.  See Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004) ("[m]ost of the core substantive standards that apply to claims of

---

[8] The court regards this definition as extremely broad, because it appears to encompass employees of every job title and contains only illusory limitations.  For example, it is unclear whether limiting the class to employees "who worked within Bozzuto's wholesale operations" has any limiting effect when Bozzuto's describes itself as a "wholesale distributor."  Def.'s Mem. at 1.  Similarly, the phrase "in Connecticut" has no limiting effect on class membership when all of Bozzuto's facilities are located in Connecticut.  To the court's reading, the plaintiffs have essentially defined their class to include every black employee at Bozzuto's in the class period.

discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause" (collecting cases)).[9]  Nor do the parties refer to any relevant differences in their briefing.  Because plaintiffs bring all three of their classwide claims (disparate impact, disparate treatment, and hostile work environment) under Title VII, but only two of their classwide claims under section 1981 (disparate treatment and hostile work environment), the court will refer generally to the legal standards of Title VII, mindful that the standards for section 1981 claims are identical for the purposes of this Motion.

The court first addresses whether the plaintiffs' three claims satisfy the threshold requirements of certification under Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.  Fed. R. Civ. P. 23(a).  The court then addresses whether class certification under any of the types listed in Rule 23(b) is appropriate.

---

[9] The Second Circuit lists substantive differences between Title VII and section 1981 claims in Patterson.  See 375 F.3d at 225-227.  Of the differences listed, only two are applicable to the present action. First, "Title VII claims are not cognizable against individuals. . . . " Id. at 226.  Thus, in the plaintiffs' Amended Complaint, the plaintiffs' Title VII claims are brought against Bozzuto's only, not against individual defendants.  That difference is not relevant to the present Motion, however, because the plaintiffs do not seek class certification with respect claims against the individual defendant claims.

Second, "a plaintiff pursuing a claimed violation of § 1981 . . . must show that the discrimination was intentional." Id.  Without the element of intent, "disparate impact claims cannot support a section 1981 violation." Stefanoni v. Darien Little League, Inc., 101 F. Supp. 3d 160, 177 (D. Conn. 2015).  Accordingly, the plaintiffs' Amended Complaint brings claims for disparate impact under Title VII only.  See Am. Compl. at Count Four.

Neither of these two differences require the court to address Title VII and section 1981 separately in this Ruling.  Where the court refers to "disparate impact," it is referring to the plaintiffs' Title VII claim, and where the court is referring to "disparate treatment" or "hostile work environment," it is referring to claims brought under both Title VII and section 1981.

A.    Rule 23(a)

1.    Numerosity

Plaintiffs must first prove that the class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity is "presumed at a level of 40 members."  Vellali v. Yale Univ., 333 F.R.D. 10, 16 (D. Conn. 2019), quoting Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).  The plaintiffs' expert estimated the size of the class at approximately 1900 members, and Bozzuto's do not appear to contest the numerosity of such a class.  See Lang Report at 5; see generally, Def.'s Mem.  The court is persuaded that the class is sufficiently numerous, even subject to the court's modifications of the proposed class definition, discussed infra at 61-62.

2.    Commonality

To satisfy Rule 23(a)(2)'s requirement of commonality, the plaintiffs must prove that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  As it is with many Title VII class actions, the "crux of this case is commonality."  Wal-Mart, 564 U.S. at 349.

In order to satisfy the commonality requirement of Rule 23(a)(2), class members' claims must "depend upon a common contention" that is "capable of classwide resolution."  Wal-Mart, 564 U.S. at 350.  Commonality requires a plaintiff to demonstrate that class members 'have suffered the same injury."  Id., quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 (1982).

> "What matters to class certification . . . is not the raising of common 'questions' —even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the

litigation. Dissimilarities within the proposed class are what have the
potential to impede the generation of common answers."

Wal-Mart, 564 U.S. at 350 (emphasis in the original) (quoting Richard A. Nagareda,

Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)).

The court discusses the commonality requirement below with respect to each of

the plaintiffs' three classwide claims: (1) disparate impact, (2) disparate treatment, and

(3) hostile work environment claims.

### a.  Disparate Impact

The plaintiffs identify three companywide policies or practices that they argue

have a disparate impact on black employees: (1) Bozzuto's six-month performance

review practice, (2) Bozzuto's Bid Policy, and (3) what they call Bozzuto's "tap-on-the-

shoulder" policy[10].  Bozzuto's argues that the plaintiffs cannot satisfy commonality

across their disparate impact claims, because these policies and practices provide

managers with broad discretion, resulting in individualized management determinations,

not a common injury across the class.  Def.'s Mem. at 30-33.  With regard to the

Bozzuto's performance review practices and the Bid Policy, the court agrees with the

plaintiffs, but only with respect to hourly, warehouse employees.  With respect to what

plaintiffs call Bozzuto's "tap-on-the-shoulder" policy for promotions, the court agrees

---

[10] The plaintiffs' Memorandum also refers to a Bozzuto's "termination policy." Pl.'s Mem. at 29-30.
The plaintiffs have not produced a policy document called the "termination policy" or otherwise described
a uniform set of procedures that amount to a "termination policy."  Although the plaintiffs' expert produces
statistics purporting to show a disparity in the rate black employees are terminated compared to white
employees, the plaintiffs have not "identif[ied] a specific employment practice or policy" necessary to state
a disparate impact claim. See Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 151 (2d Cir.
2012).  The plaintiffs seem to be ascribing the word "policy" to an alleged disparity, a disparity which
could be evidence of disparate treatment.  But the failure to identify a policy or set of uniform practices is
fatal to certification of a disparate impact class on the issue of terminations.

with Bozzuto's.

Under a disparate impact theory, a plaintiff may prevail by demonstrating that the employer "uses a particular employment practice that causes a disparate impact on the basis of race . . . ." 42 U.S.C. § 2000e-2(k)(1)(A)(i). Title VII prohibits some employment practices "that are not intended to discriminate but in fact have a disproportionately adverse effect" on a protected class. Ricci v. DeStefano, 557 U.S. 557, 577 (2009). To prove disparate impact discrimination, a plaintiff must "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 151 (2d Cir. 2012).

As the Second Circuit indicates in Chin, the first step in bringing a disparate impact claim is to "identify a specific employment practice or policy." Id. Here, the plaintiffs identify three employment policies or practices that they claim have a disparate impact: (1) Bozzuto's six-month performance review practice, (2) Bozzuto's Bid Policy, and (3) what the plaintiffs call a "tap on the shoulder" policy for promotions. To establish commonality for their disparate impact claims, the plaintiffs must first show that class members are all subject to each these policies or practices. See Wal-Mart, 564 U.S. at 349–50. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." Id. (internal quotations and citations omitted). Due to the breadth of the plaintiffs' class definition, they cannot establish that all class members, as they have defined the class, are subject to these three policies.

First, the record clearly indicates that two of these policies apply only to Bozzuto's hourly warehouse associates: (1) Bozzuto's six-month performance review

26

practice, and (2) Bozzuto's Bid Policy.  These policies and practices apply only to warehouse associates, not to other positions throughout Bozzuto's, such as drivers, or office workers.  See Peet Dep. at 205:8-17 (testifying that 60-day performance review practices applies to hourly warehouse positions);  Peet Dep. at 201:12-14 ("the Bid Policy was just for warehouse positions");  See Bid Policy at 1 (stating the "purpose" of the policy as "[t]o ensure all qualified WHSE [warehouse] associates are given the opportunity to apply or bid for another company position . . .").  Because these policies apply only to Bozzuto's warehouse associates, the plaintiffs cannot sustain class-wide disparate impact claims beyond the warehouse.

The same is true for the third of these policies – what plaintiffs refer to as a "tap-on-the-shoulder" policy.  According to the plaintiffs, this policy governs promotions to warehouse positions of lead, supervisor, and manager.  The information in the record about promotions is limited to promotions for these warehouse positions.  The record contains almost no information at all about the methods or procedures of promotions in other workplaces, such as Bozzuto's corporate office.  Accordingly, when they describe a "tap on the shoulder" policy for promotions to lead, supervisor, and manager, they are describing how promotions work for warehouse associates.

Simply put, by seeking to certify a class that is broader than warehouse associates, the plaintiffs are overreaching.  In other disparate impact cases, courts have found that commonality was satisfied when the scrutinized policies commonly apply to all class members.  See, e.g. Chen-Oster, 325 F.R.D. 55 at 64, (identifying "360 review" and "quartiling" as policies with a disparate impact, which applied to all class members).  Here, because the plaintiffs have defined their class broadly to include employees not

subject to these policies, the commonality of the plaintiffs' disparate impact claims falls at the first hurdle. However, "[w]hen confronted with an overly broad class definition, a court has the discretion to modify the class definition." Tomassini v. FCA US LLC, 326 F.R.D. 375, 386 (N.D.N.Y. 2018). Because the three practices or policies the plaintiffs identify apply only to hourly warehouse associates, commonality can only be satisfied for a more limited class of hourly warehouse associates. The court will proceed to consider whether commonality is satisfied for that, more limited, class.

       i. Applicable Law

Bozzuto's argues that, because of discretion built into Bozzuto's performance reviews, Bid Policy, and promotions, managers have the flexibility to render highly individualized employment decisions, which defeats a finding of commonality across members of the class. See Def.'s Mem. at 33. The plaintiffs argue that discretion by managers does not necessarily defeat commonality, and that plaintiffs have met their burden to establish practices that have classwide disparate impacts. See Pl.'s Mem. at 30.

In Wal-Mart, the Supreme Court held that a theory of disparate impact based solely on a policy of management discretion cannot satisfy commonality. See Wal-Mart, 564 U.S. at 356. In Wal-Mart, plaintiffs sought to certify a nationwide class action of 1.5 million women employees of Wal-Mart. Plaintiffs alleged that a policy of giving local managers discretion to make pay and promotion decisions had disproportionately disfavored women employees. However, the Supreme Court held in Wal-Mart that the class could not be certified, observing that "[t]he only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of allowing discretion by local

supervisors over employment matters." Wal-Mart, 564 U.S. at 355 (emphasis in the original).    Such a policy, the court held, is "[o]n its face, of course, ... just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices." Id. (emphasis in the original).

The Court in Wal-Mart held that, while the plaintiffs had shown aggregate disparities "at the national or regional level," the information did not establish the existence of disparities at individual stores, let alone "the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level." Id. at 356-7.  Thus, the court reasoned, plaintiffs had failed to identify a "common mode of exercising discretion" that "pervades the entire company." Id. at 356.

Courts in this Circuit have distinguished Wal-Mart based on the size of the class. See, e.g. Chen-Oster, 325 F.R.D. 55 at f.n. 11 (distinguishing its class from Wal-Mart based on a class membership of only 2,000).  Likewise, based on the size and geographical scope of this class, the present case is distinguishable from Wal-Mart. Here, the plaintiffs propose a class of approximately 1,900 Bozzuto's employees, far from the nationwide, 1.5 million members in Wal-Mart.  This reduced size makes it more likely that Bozzuto's policies have a common impact across all class members.  See Ellis v. Costco Wholesale Corp., 285 F.R.D. 492, 509 (N.D. Cal. 2012) ("it is reasonable to suspect that the larger the class size, the less plausible it is that a class will be able to demonstrate a common mode of exercising discretion").  Further, by contrast to the nationwide class in Wal-Mart, the Bozzuto's class is localized to just two zip codes in Connecticut.

More fundamentally, courts have distinguished Wal-Mart by finding what the Supreme court said was missing in that case: an employer's "common mode of exercising discretion." Wal-Mart, 564 U.S. at 352. See, e.g. Chen-Oster 325 F.R.D. 55 (S.D.N.Y. 2018) (certifying a class of women at Goldman Sachs who were subject to the same discretionary evaluation and promotion policies), see also Chalmers v. City of New York, No. 20 CIV. 3389 (AT), 2022 WL 4330119 (S.D.N.Y. Sept. 19, 2022) (certifying a class of FNDY fire protection inspectors based on three common FDNY policies that allowed for discretion in pay decisions). As the Wal-Mart opinion recognizes, a common mode of exercising discretion serves as "some glue holding together the alleged reasons for those decisions" and allows a court to find commonality even when individual managers may exercise discretion in different ways. Wal-Mart, 564 U.S. at 352.

In the present case, the defendants argue that, because of discretion built into pay, bidding, and promotions decisions at Bozzuto's, the plaintiffs have failed to identify a "common mode of exercising discretion" across Bozzuto's. Def.'s Mem. at 33. The defendant's argument overstates the holding in Wal-Mart. The phrase "common mode of exercising discretion" cannot be taken to mean that a company "divest[s] lower-level managers of all discretion," because doing so would "render the phrase 'common mode of exercising discretion' oxymoronic." Chen-Oster, 325 F.R.D. at 73. Therefore, a common mode of exercising discretion "need not strip managers of all flexibility in compensation [and promotion] decisions," but it must identify "common policies or processes." Id.

Here, the plaintiffs have identified three policies at Bozzuto's, discussed above,

30

which apply to members of the class as the court has redefined it.  See, supra, at 26-28.
Each of these policies allows some discretion on the part of managers.  Thus, in order to
find commonality for the plaintiffs' disparate impact claims, the court must find that one
or more of these policies amount to a "common mode of exercising discretion."  Wal-
Mart, 564 U.S. at 352.  Then, the court must find that the plaintiffs have offered
"significant proof" of a disparate impact.  Chen-Oster, 325 F.R.D. at 75, quoting Wal-
Mart, 564 U.S. at 353.  The court briefly addresses each of the three Bozzuto's policies
in turn.

ii. Bozzuto's Performance Review Practice

The Bozzuto's sixty-day performance review practice applies to all warehouse
associate positions.  See Peet Dep. at 205:6-12, 211:13-217:8.  On their face, the
Bozzuto's policy documents for their performance review system suggest very little
manager discretion.  Instead, the performance review system, and resulting pay raises,
are largely determined by quantitative metrics of a warehouse associate's productivity
and quality of work.  See Def.'s Ex. 36; see supra at 6-8.  However, that is not to say the
performance review process has no built-in manager discretion.  The quantitative
models that determine a warehouse associate's eligibility for a raise factor in the
number of times an employee has been formally disciplined or "written-up" for safety
and attendance issues.  Therefore, the resulting award of  "safety" and "attendance"
points suggests one way that the discretion of managers can impact a performance
review.  Thus, the system that determines whether warehouse associates are eligible
for a raise has some manager discretion.  See Pl.'s Ex. 37 ("Hebron Performance
Review") (awarding Mr. Hebron no raise in part because 12 attendance points were

31

deducted from his review score).  However, the "review score" and "production score"
are computed for warehouse associates according to the same mathematical formulas,
so there is a "common mode" linking the pay outcomes of warehouse associates.  The
court concludes that the performance review system is a "common mode of exercising
discretion" that distinguishes it from Wal-Mart.  See Chen-Oster 325 F.R.D. at 74
(concluding a points-based performance review system which allowed for some
management discretion was a 'common mode of exercising discretion').

       In the court's view, the plaintiffs have also offered "significant proof" of a
disparate impact on black warehouse associates.  Among all hourly employees at
Bozzuto's, the highest-attained hourly rate of a white employee is, on average, 10.6%
higher than a black employees' highest-attained rate.[11]  See Lang Report at Tbl. 3.
When broken down by warehouse job category, white employees earn a higher base
pay for nearly every warehouse associate position.  See Lang Report at Tbl. 5.  The
exception is the "Selector" position, which is the lowest paid position on average.  Black
selectors, on average, make $.42 per hour more than white selectors.  However, Dr.
Lang offers a credible explanation for this anomaly, because his data also shows that
black selectors remain in that role for longer, on average, than white selectors.  See

_____

[11] Dr. Amidon-Johansson, Bozzuto's expert, criticizes Dr. Lang for using an employees' highest
base pay.  Dr. Amidon-Johansson argues that Dr. Lang should have disaggregated data by year.
However, "[statistical] power increases with sample size. A gender gap of a specific magnitude (say 15%)
is more likely to show up as statistically significant in a regression analysis based on 1,000 observations
than in one based on 100 observations." William T. Bielby and Pamela Coukos, "Statistical Dueling" with
Unconventional Weapons: What Courts Should Know About Experts in Employment Discrimination Class
Actions, 56 Emory L.J. 1563, 1597 (2007).  Here, the court notes that Dr. Amidon-Johansson's
disaggregation results in a number of small samples, causing the court to doubt the statistical significance
of certain other results of hers. See, e.g., Amidon-Johansson Report at Tbl. 6.  Further, the court gives
weight to Dr. Lang's argument that an employee's highest base pay should be considered, because that
captures the advancement the employee attained at Bozzuto's.

Lang Report at Tbl. 14.  Because black selectors have remain in the selector role longer, they have more opportunities under the six-month performance review system to earn raises.  Thus, to sum up: the plaintiffs' data show that black, hourly employees earn less at Bozzuto's than white, hourly employees, and do so in nearly every job category in the warehouse.

The most striking statistical disparity in the plaintiffs' expert report is the finding about corrective reviews, or disciplinary write-ups.  Dr. Lang's data show that black employees receive corrective reviews at more than twice the rate white employees do. See Lang Report at Tbl. 11 (reporting, at a high statistical significance, that black employees receive 2.01 times as many corrective reviews as white employees). Out of employees that have received at least one corrective review, black employees receive them at a rate is 1.32 times that of white employees.[12]

For class members like Mr. Hebron, the additional attendance or safety points that come with these "corrective reviews" impact their hourly rates under the six month performance review system.  Having enough "safety" or "attendance" points can render an associate ineligible for a raise based on their "review score," as it did with Mr. Hebron.  See Hebron Performance Review at 1-2.  This disparity in discipline offers one credible explanation that may partially account for the observed disparities in hourly pay.

---

[12] The court is aware that Dr. Lang's testimony is the subject of a pending Daubert Motion by the defendants.  See Motion to Exclude the Analyses and Opinions of David M. Lang (Doc. No. 149).  The defendants filed this Motion more than five months after their opposition to class certification and the plaintiffs have not yet filed a response.  Accordingly, the court intends to consider this Daubert motion up at summary judgment.  In the meantime, it will assign weight to conflicting expert testimony.  Here, the court finds Dr. Amidon-Johannson's rebuttal on the disparity in discipline rates unpersuasive, because the court sees no reason to disaggregate data on disciplinary incidents by year. See Amidon-Johansson Report at App. B, Tbl. 1.

The observed disparity in safety and attendance points, combined with the disparity in hourly pay[13] for warehouse job titles, amounts to "significant proof" that Bozzuto's system of performance reviews has a common, classwide disparate impact on black employees.  The court concludes that the six-month performance review practice is a "common mode of exercising discretion" which determines pay for warehouse positions, and that the plaintiffs have demonstrated "significant proof" of a disparate impact.  Accordingly, the court finds commonality is satisfied with respect to Bozzuto's six-month performance review practices, as applied to warehouse associates.

      iii. <u>Bozzuto's Bid Policy</u>

Bozzuto's Bid Policy governs movements between warehouse associate positions.  <u>See</u> Bid Policy at 1; Peet Dep. at 171:10-13.  The policy applies across all of Bozzuto's warehouse facilities and is meant to ensure that "all [w]arehouse associates have access" to bids.  Bid Policy at 1.  The Bid Policy states that a "bid" will be awarded "to the most qualified candidate based on his/her prior work experience and knowledge."  Bid Policy at 2.  The policy suggests managers have some discretion, however, to identify which candidate fits that description.  Further, the plaintiffs and Bozzuto's agree that managers often exercise discretion to move warehouse associates between positions without a formal "bid" process.  Bozzuto's argues that, because managers have discretion under the Bid Policy, including by circumventing the bid process entirely, there is no "common mode of exercising discretion."  Def.'s Opp. at 28-

---

[13] The court reaches this conclusion on the present record, which contains evidence primarily related to hourly pay.  The court recognizes information about other forms of compensation, such as incentive pay, have only been produced to the plaintiffs recently, and is the subject of a pending Motion for discovery sanctions.  <u>See</u> Pl.'s Second Motion for Sanctions (Doc. No. 151).  Because the record on the issue of incentive pay is incomplete, the court leaves open the possibility that the plaintiffs' claims for payment discrimination can encompass disparities in incentive pay, not just base hourly pay.

30.  Although this presents a close question, the court disagrees.

In Wal-Mart, the Supreme Court found that the fact that class members were "subject to a variety of regional policies that all differed," precluded a finding of commonality.  Wal-Mart, 564 U.S. at 359–60 (2011).  Here, there is one written policy that applies to all warehouse associate positions, and it cabins manager discretion by laying out criteria for the awarding of "bids."  The policy also creates certain, firm limitations on the ability of warehouse employees to move between positions.  Mr. Loiseau, for example, was denied a "bid" for the forklift operator position, not because of a discretionary management decision, but because the policy prohibits awarding of "bids" where an associate has been in their position for less than six months.  Likewise, associates who have accumulated enough negative "safety" or "attendance" points can be strictly ineligible to move between positions, regardless of manager discretion. Although managers have significant discretion under the Bid Policy, the court concludes that these limitations, as well as the procedure and structure laid out by the Bid Policy, amount to a "common mode of exercising discretion" that applies to warehouse associates.

The court also concludes that the plaintiffs have offered "significant proof" that the Bid Policy has a disparate impact on warehouse employees.  First, because black employees receive corrective reviews at a rate more than twice as high as white employees, it follows that they would receive "safety" and "attendance" points at higher rates.  Under the Bid Policy, where employees accumulate enough of these points, they are ineligible for bids to higher-paying or otherwise more desirable positions.  Thus, the disparate rate at which black employees receive these points could inferably create a

disparate impact on warehouse assignments.

Whether due to discipline or another reason, the data on associates' mobility between warehouse positions supports the conclusion that the Bid Policy has a disparate impact. According to regression analyses by the plaintiffs' expert, black employees are more likely to be in lower-paying warehouse positions, particularly the selector position, which has the lowest base pay. See Lang Report at Tbl. 6 (showing that only 22.5% of white employees in the company had "selector" as their highest paid job roll, while 50.8% of black employees at the company had "selector" as their highest paid role). Dr. Lang found, with a very high degree of statistical significance, [14] that black employees are (1) more likely to be hired and remain in the selector role than white employees, and (2) black employees are less likely than white employees to occupy higher-paid warehouse roles like checkers, loaders, and clerks. See Lang Report at Tbl. 14. Simply put, the plaintiffs have shown that Bozzuto's system of warehouse assignments disproportionately concentrates black employees in the lowest paid positions. The plaintiffs statistical evidence shows, with a high degree of statistical significance, that black warehouse employees at Bozzuto's are disproportionately concentrated in those positions which, on average, are the lowest paid. In the court's

---

[14] Dr. Lang uses a "t-statistic" as a measure of the likeliness that a particular outcome would occur by chance. A t-statistic is a standard methodology to measure statistical significance; "A t-statistic greater than 1.96 in absolute value (either positive or negative) means that the excess return is significant at the 95% confidence level; a t-statistic greater than 2.58 in absolute value means that the excess return is significant at the 99% confidence level." Frank Torchio, Proper Event Study Analysis in Securities Litigation, 35 J. Corp. L. 159, 162 (2009). Dr. Lang calculates high t-statistics for certain results. For example, his conclusion that black employees are more likely than white employees to be selectors has a t-statistic of 7.61, his conclusion that black employees are less likely to be Checkers has a t-statistic of 2.77, and his conclusion that black employees are less likely to be Loaders has a t-statistic of 3.57. See Lang Report at 19.

view, that is "significant proof" of a disparate impact.

Because the Bozzuto's Bid Policy is a common mode of exercising discretion, and plaintiffs have shown significant proof of a disparate impact, the court concludes there is commonality with respect to the plaintiffs' disparate impact claim as it relates to the Bid Policy, for a class limited to black warehouse associates.

iv. <u>Promotions to Lead, Supervisor, and Manager Roles</u>

Plaintiffs contend that promotions to warehouse management roles, including lead, supervisor, and manager, are governed by a 'tap on the shoulder' system, where certain candidates are selected for promotions without an open application process. The plaintiffs claim that applications for these positions are not posted in a way that is accessible for warehouse associates.  Pl.'s Mem. at 24.  The result of this system, plaintiffs claim, is a management at Bozzuto's that is overwhelmingly white.  <u>Id.</u> at 25.

For promotion to "lead" roles, Bozzuto's concedes it has a tap on the shoulder system.  <u>See</u> Cerreta Dep. at 22:19-23:8 ("leads tend not to be open jobs . . .  [t]hey don't get posted").  However, for supervisor and manager promotions, Bozzuto's disputes the "tap on the shoulder" characterization by asserting that has an open application process for those roles.  <u>See</u> Def.'s Mem. at 31.

The court need not resolve this dispute here.  Even accepting the plaintiffs' assertions as true, the court concludes that a "tap on the shoulder" policy is not a "common mode of exercising discretion," and therefore runs afoul of the Supreme Court's holding in <u>Wal-Mart</u>.

The court is unaware of any policy document, or shared set of practices, that establishes common criteria or procedures for these promotions at all of Bozzuto's

warehouses.  Thus, there is no evidence in the record that these promotions take place according to a "common mode of exercising discretion."  Wal-Mart, 564 U.S. at 356.  In the court's view, the plaintiffs cannot fall back here on their characterization of a 'tap-on-the-shoulder' system to identify a common mode of exercising discretion: each "tap" is made based on each individual supervisors or group of supervisors making the "tap."

After Wal-Mart was remanded to the District Court, the plaintiffs tried to frame Wal-Mart's system as a "tap on the shoulder" policy, but the District Court rejected that framing as a basis for commonality.  See Dukes v. Wal-Mart Stores, Inc., ("Wal-Mart II") 964 F. Supp. 2d 1115, 1119 (N.D. Cal. 2013).  Here, the court finds the reasoning in Wal-Mart II to be persuasive.  The District Court concluded that the framing of a "tap on the shoulder" policy "leaves Plaintiffs right back where they started: challenging Wal-Mart's practice of delegating discretion to local managers, which the Supreme Court specifically held was not a specific employment practice supplying a common question sufficient to certify a class."  Id. (emphasis in original).

In the present case, the result is the same.  For promotions into warehouse management, the only Bozzuto's policy that the plaintiffs identify is a policy of manager discretion.  In the court's view, that runs afoul of the Supreme Court's holding in Wal-Mart.  Because the plaintiffs have failed to identify a policy that amounts to a "common mode of exercising discretion,"  Wal-Mart, 564 U.S. at 356,  the court does not find commonality for plaintiffs' disparate impact claims as they relate to promotions to warehouse supervisor positions.

In sum, for the plaintiffs' disparate impact claims, the court finds that the plaintiffs' claims are limited to warehouse associates, and modifies the class definition to conform

to that limitation.  With respect to Bozzuto's six-month performance review practices and Bozzuto's Bid Policy, the court concludes that commonality is satisfied.  Due to the lack of a policy serving as a "common mode of exercising discretion," court does not find commonality for the plaintiffs' disparate impact claims about promotions to lead, manager, or supervisor positions.

b.    Disparate Treatment

In addition to their disparate impact claims, the plaintiffs bring claims of disparate treatment.  The plaintiffs allege that Bozzuto's intentionally discriminates against black employees with respect to pay, discipline, warehouse work assignments, promotions, and terminations.  See Pl.'s Mem. at 23-28.

"Unlike disparate impact claims, where the employer's practice or policy is facially neutral, a disparate treatment claim is based on the allegation that the defendant engaged in intentional discrimination."  Kassman v. KPMG LLP, 416 F. Supp. 3d 252, 281 (S.D.N.Y. 2018) (emphasis added).  "Disparate treatment claims do not require plaintiffs to identify a specific company-wide employment practice responsible for the discrimination."  Id.  Instead, plaintiffs must provide evidence of a "systemwide pattern or practice" of pervasive discrimination against the class, such that the discrimination is "the regular rather than the unusual practice."  Teamsters, 431 U.S. at 336.  Such a showing creates a rebuttable presumption of discriminatory intent, but the ultimate burden of persuasion rests with the plaintiff to show that the defendant acted with such an intent.  See United States v. City of New York, 717 F.3d 72, 84 (2d Cir. 2013).

At the outset, the court holds that, like the plaintiffs' disparate impact claims, their disparate treatment claims simply cannot support such a broad class definition.  This

conclusion is perhaps clearer for their disparate impact claims, because the policies at issue in those claims only apply to warehouse associates.  Disparate treatment claims do not require the identification of a policy.  However, the court nonetheless reaches a similar conclusion and likewise narrows the class definition to black, hourly warehouse associates.

As noted above, the plaintiffs' proposed class definition reaches every black employee at Bozzuto's, including hourly and salaried employees, and employees in other work environments like offices and driving operations.  Other than Dr. Lang's data, the record contains almost no information at all about non-warehouse positions. Accordingly, the court cannot conclude that the manner of any purported disparate treatment is the same across all Bozzuto's work environments, or between salaried and hourly workers.  The court simply cannot conclude on the present record that the means and manner of disparate treatment are the same between an entry-level black selector, and a black vice president.[15]  To do so would be to push Rule 23 beyond its breaking point.  Thus, the court exercises its discretion again for the plaintiffs' disparate treatment claims, to appropriately limit the class to black, hourly warehouse associates.

The Supreme Court in Wal-Mart suggested two ways that plaintiffs can show commonality for classwide disparate treatment claims.  First, if the employer " 'used a biased testing procedure to evaluate both applicants for employment and incumbent employees;" second, by showing "[s]ignificant proof that an employer operated under a general policy of discrimination . . . ." Wal-Mart, 564 U.S. 338 at 353, quoting Gen. Tel.

_____

[15] The data in Dr. Lang's initial expert report indicated that Bozzuto's had no black vice presidents. However, a recently filed expert report supplement suggests that Bozzuto's now has a black vice president.  See Supplemental Analyses of David M. Lang (Doc. No. 151-5).

Co. of Sw. v. Falcon, 457 U.S. 147, 159 (1982).  "Such proof may take the form of significant statistical evidence or anecdotal evidence." (internal quotations omitted) Feeley v. City of New York, No. 20-CV-1770 (AMD)(PK), 2023 WL 2918861, at *7 (E.D.N.Y. Mar. 24, 2023).  In the liability phase of a pattern or practice disparate treatment case, "strong statistical evidence, without anecdotal evidence, may in some cases form a prima facie case."  Robinson v. Metro-N. Commuter R.R. Co., 267 F.3d 147, 158 (2d Cir. 2001).

In the present case, the court finds that the plaintiffs have presented strong statistical evidence that amounts to "significant proof" of a "policy of discrimination."  As stated above, the plaintiffs have provided credible expert analysis documenting racial disparities in discipline, hourly pay, and mobility to more favorable warehouse positions. See Chalmers v. City of New York, No. 20 CIV. 3389 (AT), 2022 WL 4330119, at *16 (S.D.N.Y. Sept. 19, 2022) (finding that "statistically significant pay disparities" supported the plaintiffs' disparate treatment claim).  Perhaps most striking, again, is Dr. Lang's finding that black employees receive corrective reviews at more than twice the rate of white employees at Bozzuto's.  See Lang Report at Tbl. 11.  In the court's view, this is disparate treatment that impacts performance reviews and warehouse assignments. Dr. Lang found that the average hourly warehouse worker at Bozzuto's across the class period made only $18.44 per hour, while the average white hourly worker made $20.45 per hour.  See id. at Tbl. 3.  Dr. Lang also found that black employees disproportionately languish in lower-paid warehouse positions compared to white colleagues, who more quickly advance into warehouse positions that have higher hourly pay rates.  See id. at Table 14.  In the court's view, this evidence is sufficient to amount to significant,

statistical proof of disparate treatment across workplace discipline, pay, and warehouse assignments.  Further, the plaintiffs also demonstrate disparities in the involuntary termination rates for black employees.  Across the class period, while only 33.9% of white employee terminations were involuntary, 57% of black employee terminations were involuntary.  See Lang Report, Tbl. 18.  Finally, regarding promotions to warehouse supervisor positions like Lead, Manager, and Supervisor, Dr. Lang calculated that only 1.7 percent of black employees at Bozzuto's occupy these positions, compared to 14.5 percent of white employees at Bozzuto's.  See Lang Report, Tbl. 6.  Dr. Lang calculated, at a very high level of statistical significance, that black employees are less likely to be in these warehouse leadership positions.  Thus, the court concludes that with respect to every issue encompassed by their disparate treatment claims – hourly pay, discipline, warehouse assignments, promotions, and terminations – that plaintiffs have demonstrated significant statistical disparities.  See Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307–08, (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.").

In addition to their statistical proof, plaintiffs also offer some anecdotal evidence, which is largely limited to Bozzuto's North Haven facility.  See Hebron Dep. at 163:9-164:13, (testifying that a manager told a black employee that he reminded him of Caesar, an ape character in the "Planet of the Apes" movie franchise); see Pl.'s Ex. 24 at 1 (black employee reporting in an email that he has heard comments like "bum a*s n****r," "lazy a*s n****r," and reporting that coworker wrote "you don't belong here leave stinky a*s n****r" on their locker, with little response from management);  see Cerreta

Dep. at 87:20-88:2 and 90:9-10 (testifying that he has overhead racial slurs "in the break room or outside" but has "never written anybody up for it"); see Pl.'s Mem. at n. 21 (citing other examples). Granted, this anecdotal evidence is extremely limited compared to other pattern-or-practice cases, where plaintiffs submit numerous anecdotal accounts to bolster their statistical evidence. See, e.g., Chen-Oster, 325 F.R.D. at 76 ("Plaintiffs have submitted internal complaints, external complaints, survey answers, emails, articles, business records, and declarations from class members").

However, the court concludes that, taken together with the plaintiffs' stronger statistical evidence, it is sufficient to amount to "significant proof" of a "general policy of discrimination." Wal-Mart, 564 U.S. at 353. Accordingly, the court finds commonality exists with respect to the plaintiffs' disparate treatment claims.

c.      Hostile Work Environment

The plaintiffs seek certification of their hostile work environment as a pattern-or-practice claim. See Pl.'s Mem. at 23. Bozzuto's argues that, because plaintiffs' evidence is largely limited to the North Haven facility, the plaintiffs cannot demonstrate commonality between work environments across Bozzuto's. See Def.'s Mem. at 34. The court agrees with Bozzuto's.

To prevail under a hostile work environment claim under Title VII, a plaintiff must show "(1) harassment that was sufficiently severe or pervasive to alter the conditions of her employment, creating an abusive working environment, and (2) a sufficient basis for imputing the conduct that created the hostile environment to her employer." Serrano v. New York State Dep't of Env't Conservation, 714 F. App'x 90, 91 (2d Cir. 2018). "The incidents complained of must be more than episodic; they must be sufficiently

continuous and concerted in order to be deemed pervasive." Littlejohn v. City of New York, 795 F.3d 297, 321 (2d Cir. 2015), quoting Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014).

The named plaintiffs allege that they were subject to a hostile work environment at the North Haven facility. See Am. Compl.; Pl.'s Mem. at 9, Fn. 21 (collecting testimony). As with the plaintiffs other Title VII claims, the plaintiffs must prove that class members "have suffered the same injury," including class members who work at Bozzuto's other warehouse facilities. Wal-Mart, 564 U.S. at 350. In evaluating pattern-or-practice hostile work environment claims, courts have questioned whether prospective class members are really subject to the same "work environment," or whether they are subject to "separate [work] environments" for Title VII purposes. See, e.g., Brown v. Nucor Corp., 576 F.3d 149, 158 (4th Cir. 2009), as amended (Oct. 8, 2009). "Courts have generally approved of hostile work environment class actions where the work environment is localized. . . ." ." Lamarr-Arruz v. CVS Pharmacy, Inc., No. 15-CV-04261 (JGK), 2017 WL 4277188, at *5 (S.D.N.Y. Sept. 26, 2017) (collecting cases). "By contrast, courts have viewed multi-site hostile work environment class actions with skepticism." Id. (collecting cases). The pattern-or-practice cases cited by the plaintiffs conform to this trend. See E.E.O.C. v. Dial Corp., 156 F. Supp. 2d 926, 930 (N.D. Ill. 2001) (finding pattern-or-practice treatment appropriate for sexual harassment claims at a single manufacturing plant); see E.E.O.C. v. Mitsubishi Motor Mfg. of Am., Inc., 990 F. Supp. 1059, 1069 (C.D. Ill. 1998) (approving pattern-or-practice treatment for hostile work environment claims at a single auto assembly facility).

44

Here, the plaintiffs' evidence of a hostile work environment is overwhelmingly concentrated at the North Haven facility, where the three named plaintiffs worked.  <u>See</u> Pl.'s Mem. at 9.  By contrast, the record contains only scattered evidence about work environments in Bozzuto's Cheshire facilities.  Plaintiffs refer to the testimony of Mr. Cerreta, who used to work at Cheshire facilities, that he has "overheard . . . certain language like [slurs] in the break room or outside. . . ." Cerreta Dep. at 87:13-88:6.  The plaintiffs also offer several March 2022 letters from Bozzuto's human resources department informing several dozen employees that a recent human resources investigation had uncovered evidence of "[d]iscriminatory language, name calling, and racial slurs" in the office support section of one Cheshire warehouse.  <u>See</u> Pl.'s Ex. 28 at 3-28.  Finally, the plaintiffs offer two sealed affidavits from employees in Bozzuto's Cheshire facilities, who allege that managers wrongfully denied them bonuses and incentive pay, and that supervisors have yelled and cursed at them, among other things. <u>See</u> Doc. No.s 97-1, 97-2.  This evidence, taken together, offers only an incomplete picture of Bozzuto's other facilities.  It is insufficient to demonstrate a "sufficiently continuous and concerted" hostility across all of Bozzuto's facilities.  <u>See</u> <u>Littlejohn</u>, 795 F.3d at 321.  Additionally, in the court's view, the affidavits allege misconduct that is different in character from the hostile work environment alleged in the North Haven facility, which is largely based on racial slurs and other racially derogatory language. The differences undercut, rather than support, commonality.

The court must be clear: in reaching this conclusion, the court in no way means to diminish the allegations of the named plaintiffs or other allegations about the North Haven facility.  Indeed, if believed by a jury, this testimony could likely lead to a

significant plaintiff's verdict. Here, the court concludes only that the evidence is not sufficient to establish that one, common hostile work environment exists across the entire company.

Finally, at oral argument, the plaintiffs argued that statistical evidence showing a disparity in the rates black employees receive corrective reviews is evidence that, through workplace discipline, Bozzuto's supervisors have created a uniform hostile work environment. However, the court understands this as evidence of disparate treatment more than a hostile work environment, because receiving a corrective review does not necessarily rise of the level of hostility or abuse as defined in a hostile work environment action. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, (1993) (defining a hostile work environment as a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" (internal citations and quotations omitted)).

In the present case, the defendants are correct that the plaintiffs' evidence supporting a hostile work environment is largely confined to the North Haven facility. Because the plaintiffs have not proven that the same alleged hostile work environment exists at Bozzuto's other facilities, the court does not find commonality for the plaintiffs' hostile work environment claims. The Motion for Certification with respect to the plaintiffs' hostile work environment claims is therefore denied.

In sum, the court finds commonality for some of the plaintiffs' claims but not others. First, for the plaintiffs' disparate impact and disparate treatment claims, the court views the appropriate class as a class of black, hourly warehouse associates at

46

Bozzuto's.  For the plaintiffs' disparate impact claims, the court finds commonality for

the six-month performance review system and Bid Policy only, not "tap on the shoulder"

policies for promotions.  The court finds commonality for the plaintiffs disparate

treatment claims, because the plaintiffs have offered significant statistical proof of a

pattern or practice of discrimination.  The court does not find commonality on the

plaintiffs' hostile work environment claims, because the plaintiffs have not come forward

with sufficient evidence that a common hostile work environment exists all of Bozzuto's

warehouses.

     3.     Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties

are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(b)(3).  Rule

23(a)(3)'s requirement of typicality "is satisfied when the lead plaintiffs' claims arise from

the same series of events and find support in the same legal theories as the claims of

all of the remaining class members."  Houser v. Pritzker, 28 F. Supp. 3d 222, 245

(S.D.N.Y. 2014).  Typicality does not require that the situations of the named

representatives and the class members be identical, "but merely that the class

representatives have the 'incentive to prove all the elements of the cause of action

which would be presented by the individual members of the class were they initiating

individualized actions."  Id., quoting In re NASDAQ Mkt.-Makers Antitrust Litig., 169

F.R.D. 493, 510 (S.D.N.Y. 1996).

In the present case, each of the named plaintiffs was subject to the policies at

issue in the plaintiffs' disparate impact claims, for which the court found commonality:

the Bozzuto's six-month performance review policy and the Bozzuto's Bid Policy.  All

47

three plaintiffs were issued corrective reviews, resulting in safety and/or attendance points which financially impacted them during performance reviews. See, supra, at 11-17. All three named plaintiffs were subject to the Bid Policy and moved between different warehouse associate positions. See id. The court is satisfied, therefore, with respect to the plaintiffs' disparate impact claims for these two policies, Mr. Loiseau, Mr. Hebron, and Mr. Small's claims "arise from the same series of events and find support in the same legal theories as the claims of all of the remaining class members." Chen-Oster v. Goldman, Sachs & Co., 325 F.R.D. 55, 78 (S.D.N.Y. 2018), quoting "Houser v. Pritzker, 28 F. Supp. 3d 222, 245 (S.D.N.Y. 2014).

Likewise, the court is satisfied that the plaintiffs were subject to the same purported disparate treatment that manifests in disparities in pay, discipline, warehouse assignments, promotions, and terminations, and are therefore typical of the claims of other class members.

Bozzuto's argues that none of the named plaintiffs are typical of plaintiffs alleging disparate treatment for failure to promote, because none of them applied to the positions of manager or supervisor, and therefore they suffered no adverse employment action. Def.'s Mem. at 3. While that standard may apply to individual failure to promote claims, it misstates the plaintiffs' burden for pattern-or-practice claims under Teamsters. In an individual failure to promote case, "the plaintiff's initial burden consists of the now familiar components of showing "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of

48

complainant's qualifications" . United States v. City of New York, 717 F.3d 72, 83–84

(2d Cir. 2013).  Thus, for an individual failure to promote claim, a plaintiff typically must

show that he or she applied for a position and was denied.

However, pattern or practice claims do not require the same adverse

employment action for each claimant:

> "In a pattern-or-practice [class action] case, the plaintiff's initial burden is
> heavier in one respect and lighter in another respect than the burden in an
> individual case. It is heavier in that the plaintiff must make a prima facie
> showing of a pervasive policy of intentional discrimination, see Teamsters,
> 431 U.S. at 336, rather than a single instance of discriminatory treatment.
> It is lighter in that the plaintiff need not initially show discrimination against
> any particular present or prospective employee. See id. at 360. . .
> Although instances of discrimination against particular employees are
> relevant to show a policy of intentional discrimination, they are not
> required; a statistical showing of disparate impact might suffice."

Id. (emphasis added, citations omitted).  Thus, pattern or practice claims under

Teamsters do not require that every plaintiff or class member suffer from each particular

type of adverse employment action (here, failure to promote).  In this court's view, it is

sufficient to satisfy typicality that the claims of the named plaintiffs are rooted in some

form of disparate treatment, which is a manifestation of the company's pattern-or-

practice of discrimination.  Here, the plaintiffs plausibly alleged that they were subject to

disparate treatment in pay, warehouse assignments, and discipline.  Thus, their claims

are typical of other members of a pattern-or-practice class.

Therefore, with respect to the plaintiffs' remaining disparate impact and disparate

treatment claims, the court finds that they "arise from the same series of events and find

support in the same legal theories as the claims of all of the remaining class members."

Houser v. Pritzker, 28 F. Supp. 3d at 245.  Accordingly, for their remaining claims, the

court concludes that the plaintiffs satisfy typicality.

    4.    Adequacy

Rule 23(a)'s prerequisite of adequacy requires that the named plaintiffs "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Adequacy requires courts to consider whether the "(1) plaintiff[s'] interests are antagonistic to the interest of other members of the class" and whether the "(2) plaintiff[s'] attorneys are qualified, experienced and able to conduct the litigation."  Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000).

Regarding the first requirement, the three named plaintiffs all submitted affidavits stating that they "have no known conflicts of interest with the other [n]amed [p]laintiffs or putative class members."  See Affidavit of Don-Rudy Loiseau (Doc. No. 136-2) at ¶ 4; Affidavit of Quinton Hebron (Doc. No. 136-3) at ¶ 4; Affidavit of Dwayne Small (Doc. No. 136-4) at ¶ 4.  These affidavits do little to mitigate the court's concern.

Because of Mr. Loiseau's individual retaliation claims, and because the Motion is denied with respect to all three of the plaintiffs' hostile work environment claims, each of the named plaintiffs have individual claims against Bozzuto's and the other individual defendants.  These individual claims will exist alongside any classwide claims the court decides to certify.  In its prior Order, the court expressed concern about such individual claims.  See Order (Doc. No. 21) at 2-3.  The essence of the court's concern is that the named plaintiffs will come to the settlement negotiations and may face tradeoffs between zealously representing the class and obtaining favorable settlements for their individual claims.  See id.  The court's concern on this matter is not insignificant.

Having reviewed the evidence in the record supporting the named plaintiffs'

hostile work environment claims, the court is mindful of the possibility that the value of these claims may end up being significant, compared to the relatively smaller individual damage figures for hourly pay discrimination.  The court therefore views this possible conflict of interest as a concern.

Of course, a named plaintiffs' individual claim, such as a retaliation claim, does not by itself demonstrate representative inadequacy. See Chen-Oster v. Goldman, Sachs & Co., 325 F.R.D. 55, 79 (S.D.N.Y. 2018) ("an individual retaliation claim is not disqualifying for a class representative").  In order to defeat a certification motion, the conflict "must be fundamental."  In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009).  Although the court is mindful of how the plaintiffs' individual claims potentially put them in a different position relative to other class members, it is not convinced that their individual claims would create a "fundamental" conflict between the named plaintiffs and class members.  Id.  And because the plaintiffs have otherwise diligently participated in the litigation by sitting for depositions, producing responsive documents, filing discrimination charges with the CRHC and EEOC, and in other ways, the court ultimately concludes that they are adequate representatives for the class.  See Loiseau Affidavit, Hebron Affidavit, Small Affidavit at ¶3.

Secondly, the court must inquire whether the plaintiffs' attorneys are "qualified, experienced and able to conduct the litigation."  Baffa, 222 F.3d at 60.  The court takes this requirement seriously, especially where, as here, the plaintiffs rely on the Teamsters framework for pattern or practice cases, which was initially promulgated "as a method of proof for pattern-or-practice claims brought by the government under Title VII. . . ." Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 183 (3d Cir. 2009)

(emphasis added).  Because of the demands of the <u>Teamsters</u> framework and of class litigation generally, the court must set a high bar in demanding adequate class counsel. Rule 23(g)(1)(A) requires a court to consider: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A)

The court previously ordered the plaintiffs to demonstrate the adequacy of their representation, based on the fact that the case was initially brought by Attorney Nitor Egbarin, a lawyer with limited experience with class actions and employment law.  <u>See</u> Order (Doc. No. 21).  After the court issued that Order, the plaintiffs retained Attorney Daniel Kotchen.  <u>See</u> Order Granting Motion for Attorney Daniel Kotchen to Appear Pro Hac Vice (Doc. No. 25).  Attorney Kotchen and his law firm have taken the "lead role" in representing the plaintiffs, and the court is satisfied both with the quality of their representation and their experience in class action litigation and Title VII law.[16]  <u>See</u> Plaintiffs' Brief Regarding Adequacy of Plaintiff Loiseau and Counsel (Doc. No. 29). The court finds that the plaintiffs have met their burden to demonstrate adequacy.

5.    Ascertainability

The implied requirement of ascertainability requires that a class be "sufficiently definite so that it is administratively feasible for the court to determine whether a

---

[16] Attorney Kotchen did not file a declaration describing his work on the case or his qualifications to be class counsel. However, his background was addressed at oral argument, and the record has sufficient information about his experience.  <u>See</u> Transcript at 56:10-60:2; <u>See</u> Exhibit Declaration of Daniel Kotchen (Doc. No. 29-1).

particular individual is a member."  In re Petrobras Sec., 862 F.3d 250, 260 (2d Cir. 2017).

To be a member of this class, as defined by the court, someone must be (1) black, (2) a Bozzuto's employee, and (3) worked in an hourly warehouse position during the class period.  Bozzuto's employment records and data appear to indicate an employees' race, as well as job title and years employed, and the parties' experts have been able to use these records to perform data analysis about the class.  See Lang Report; Amidon-Johansson Report.  Thus, the court concludes that the class is ascertainable based on discovered employment records.

Having concluded that certain of the plaintiffs' disparate impact claims, as well as their disparate treatment claims, meet the requirements of Rule 23(a) for a modified class of hourly, warehouse associates, and that the class is ascertainable, the court will proceed to consider whether the class can be certified under one of the types laid out in Rule 23(b).

B.    Rule 23(b)(2)

The plaintiffs move for class certification under Rule 23(b)(2) as well as Rule 23(b)(3).

Under Rule 23(b)(2), a district court may certify a class that meets the requirements of Rule 23(a) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The Advisory Committee notes to Rule 23 provide that certification under Rule 23(b)(2) "does not extend to cases in which the appropriate final relief

relates exclusively or predominantly to money damages."  Rule 23, Advisory Committee Notes at 1937 Adoption.  The Supreme Court went a step further in <u>Wal-Mart</u> and stated that claims for monetary relief should not be certified under Rule 23(b)(2) "at least where . . . the monetary relief is not incidental to the injunctive or declaratory relief." <u>Wal-Mart</u>, 564 U.S. at 360.  The <u>Wal-Mart</u> Court reasoned that classwide claims that would result in "individualized relief" like backpay violate the "indivisible nature of the injunctive or declaratory remedy" of Rule 23(b)(2), and would effectively bypass the protections of Rule 23(b)(3), including notice and opt-out rights.  <u>Id.</u> at 360-61.

In the present case, the court concludes that certification under Rule 23(b)(2) is inappropriate.  The plaintiffs' Amended Complaint seeks compensatory damages, including individualized damages such as front- and back-pay, as well as punitive damages.  These damage requests are not merely incidental to the plaintiffs' requested injunctive relief.  Further, the class includes numerous former employees of Bozzuto's not seeking reinstatement, who lack standing to seek injunctive relief and therefore could only recover monetary damages.  <u>See Walker v. Accenture PLC</u>, 511 F. Supp. 3d 169, 186 (D. Conn. 2020) (holding that "generally . . . former employees lack standing to obtain injunctive relief" unless they seek reinstatement).  Because all of the proposed class members have putative claims for money damages, the court concludes that final relief relates predominantly to money damages.  <u>See Hecht v. United Collection Bureau, Inc.</u>, 691 F.3d 218, 224 (2d Cir. 2012) (holding that money damages were predominant when the class was defined "to ensure that every member would be entitled to <u>damages</u>, but not that every member would have standing to seek injunctive relief").

Because the plaintiffs' claims for money damages are predominant, the plaintiffs'

Motion is denied to the extent it seeks to certify the class pursuant to Rule 23(b)(2).

      C.    <u>Rule 23(b)(3)</u>

Under Rule 23(b)(3), a district court may certify a class which meets the requirements of Rule 23(a) and if (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts refer to these requirements as "predominance" and "superiority." <u>See</u> <u>e.g.</u> <u>Chen-Oster,</u> 325 F.R.D. at 80.

      1.    Predominance

The Rule 23(b)(3) predominance requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." <u>Myers v. Hertz Corp.</u>, 624 F.3d 537, 547 (2d Cir. 2010) (internal quotation marks and citations omitted). When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." <u>Tyson Foods, Inc. v. Bouaphakeo</u>, 577 U.S. 442, 453 (2016).

"Common issues—such as liability—may be certified, consistent with Rule 23, even where other issues—such as damages—do not lend themselves to classwide proof." <u>Johnson v. Nextel Commc'ns Inc.</u>, 780 F.3d 128, 138 (2d Cir. 2015). "It is primarily when there are significant individualized questions going to liability that the

55

need for individualized assessments of damages is enough to preclude 23(b)(3)

certification" Id., quoting Klay v. Humana, Inc., 382 F.3d 1241 at 1260 (11th Cir. 2004).

To determine whether the predominance requirement is satisfied, courts must

assess "(1) the "elements of the claims and defenses to be litigated"; and (2) "whether

generalized evidence could be offered to prove those elements on a class-wide basis or

whether individualized proof will be needed to establish each class member's

entitlement to relief. Nextel Commc'ns Inc., 780 F.3d at 138 (2d Cir. 2015). The court

finds that resolution of both the plaintiffs' disparate impact and disparate treatment

claims depend on generalized proof more than individualized proof, at least at the

liability stage., and therefore satisfy the predominance requirement.

a. Disparate Impact

Under a disparate impact theory of liability, a plaintiff must prove that the

employer "uses a particular employment practice that causes a disparate impact on the

basis of race. . . ." 42 U.S.C. § 2000e-2(k)(1)(A)(i). To prove disparate impact

discrimination, a plaintiff must (1) identify a specific employment practice" or policy, (2)

demonstrate that a disparity exists; and (3) establish a causal relationship between the

two. Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 151 (2d Cir. 2012)

(internal citations and quotations omitted). "The statistics must reveal that the disparity

is substantial or significant, and must be of a kind and degree sufficient to reveal a

causal relationship between the challenged practice and the disparity." Id.

A plaintiff can state a prima facie case of disparate impact by making "a threshold

showing" that a policy leads to "a significant statistical disparity." Ricci v. DeStefano,

557 U.S. 557, 587 (2009). An employer may defend "against liability by demonstrating

56

that the practice is job related for the position in question and consistent with business necessity." Id. (Internal quotations omitted).  Even if an employer meets that burden, however, a plaintiff may still prevail "by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs."[17]  Id. See also 42 U.S.C.  §§ 2000e-2(k)(1)(A)(ii) and (C).

Of the plaintiffs' claims that satisfy Rule 23(a), the plaintiffs have identified the six-month performance review practices and Bid Policy as policies that they allege have a disparate impact.  In order to state a prima facie case of disparate impact for these policies, the plaintiffs have the make a threshold showing that the performance review practices led to statistically significant differences in the pay of black employees, and that the Bid Policy disproportionately concentrated black employees in lower paying jobs.  Both of these questions deal with generalized, not individual, proof.  Likewise, if the burden shifts to Bozzuto's to demonstrate business necessity for the job practices, they will likely do so in a way that relies primarily on generalized evidence of business necessity, not individual cases.  Finally, the question of whether there are alternatives to the performance review policy and Bid policy that have less disparate impact is a question that can only be answered generally.

Accordingly, the court concludes that Bozzuto's liability under the plaintiffs' disparate impact claim "can be achieved through generalized proof."  See Myers 624

---

[17] The court recognizes that the Second Circuit has repeatedly held that juries should not be charged on burden-shifting frameworks in Title VII cases.  See Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 130 (2d Cir. 2012) ("juries should not be charged on the McDonnell Douglas burden-shifting framework").  Thus, these burden-shifting frameworks may describe, more appropriately, the parties' respective burdens in dispositive motions heard by the court.  However, reference to these frameworks serves the limited purpose here of analyzing whether liability can be established through generalized, rather than individualized, proof.

F.3d at 547. Although the question of damages may turn on individualized proof, "common issues—such as liability—may be certified, consistent with Rule 23, even where other issues—such as damages—do not lend themselves to classwide proof," Nextel Commc'ns Inc., 780 F.3d at 138. Because the questions that determine liability for the plaintiffs' disparate impact claims turn on general proof, the court concludes that they satisfy the predominance requirement of Rule 23(b)(3).

b.    Disparate Treatment

Unlike the plaintiff's disparate impact claims, disparate treatment claims do not require plaintiffs to identify a specific company-wide employment practice responsible for the discrimination. Kassman v. KPMG LLP, 416 F. Supp. 3d 252, 281 (S.D.N.Y. 2018). To state a prima facie case for their disparate treatment claims, the plaintiffs will have to present "evidence supporting a rebuttable presumption that an employer acted with the deliberate purpose and intent of discrimination against an entire class." United States v. City of New York, 717 F.3d 72, 87 (2d Cir. 2013), citing Teamsters, 431 U.S. 324 (1977).

To state a prima facie case of disparate treatment discrimination, the plaintiffs must provide evidence of a "systemwide pattern or practice" of discrimination and prove by a preponderance of the evidence that discrimination is "the company's standard operating procedure." Teamsters, 431 U.S. at 336 (1977). The plaintiffs may satisfy this burden through the use of statistical evidence alone. See Hazelwood, 433 U.S. at 307–08 ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination"). Under the framework laid out in Teamsters, if plaintiffs can meet this burden, the burden shifts to

58

the defendants to "provid[e] a nondiscriminatory explanation for the apparently discriminatory result" that can rebut the inference of discriminatory intent.  City of New York, 717 F.3d at 84, quoting Teamsters, 431 U.S. at 336 (1977).  If the defendant satisfies this burden, "the presumption arising from the plaintiff's prima facie case drops out, and the trier of fact must then determine, after a full trial, whether the plaintiff has sustained its burden of proving by a preponderance of the evidence the ultimate fact at issue."   Id. (internal citations and quotations omitted).

In the court's view, these questions of liability are likely to turn on methods of generalized proof much more than individualized proof.  The plaintiffs are likely to rely on their statistical evidence to establish a prima facie pattern or practice claim, because they document disparities in pay, corrective reviews, and warehouse roles across the entire class, not anecdotally.  Likewise, should the burden shift to defendants to demonstrate a "nondiscriminatory explanation for [an] apparently discriminatory result," see City of New York, 717 F.3d at 84, then, to carry their burden, the defendants would have to provide an explanation that stretches across the entire class.  For this framework of liability, generalized proof, rather than individualized anecdotal proof, is a substantially more likely method of proving liability.

Although individual damages will likely involve individualized proof, predominance can be satisfied even where "damages . . .do not lend themselves to classwide proof."  Nextel Commc'ns Inc., 780 F.3d at 138 (2d Cir. 2015).  Under the Teamsters framework for classwide disparate treatment claims, it is appropriate to determine the "scope of individual relief" after the "liability phase" of the trial.

59

Teamsters, 431 U.S. at 361.  Thus, the court concludes that predominance is satisfied

for the plaintiffs' disparate treatment claims.

Therefore, the predominance requirement is satisfied for both the plaintiffs'

disparate impact and disparate treatment claims.

2.    Superiority

Rule 23(b)(3) requires that a "class action [be] superior to other available

methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

In assessing whether classwide litigation is superior, courts must consider four

nonexclusive factors:  "(1) the interest of the class members in maintaining separate

actions," (2) "the extent and nature of any litigation concerning the controversy already

commenced by or against members of the class," (3) "the desirability or undesirability of

concentrating the litigation of the claims in the particular forum," and (4) "the difficulties

likely to be encountered in the management of a class action."  In re Nassau Cnty. Strip

Search Cases, 461 F.3d 219, 230 (2d Cir. 2006).

First, the court concludes that the interest of the class members in maintaining

separate actions is small.  "[D]isaggregating the claims into hundreds of individual

proceedings would only waste time, effort, and expense and increase the likelihood of

conflicting outcomes for plaintiffs."  Chalmers v. City of New York, No. 20 CIV. 3389

(AT), 2022 WL 4330119, at *19 (S.D.N.Y. Sept. 19, 2022), quoting Amchem, 521 U.S.

at 634.  Further, due to the nature of substantive Title VII law, "it would be absurd to

have more than a hundred class members . . . separately litigate the question of class-

wide liability."  Easterling v. Connecticut Dep't of Correction, 278 F.R.D. 41, 50 (D.

Conn. 2011)  And because the damages for individual warehouse associates may in

many cases be relatively small, those claimants would struggle to secure representation to bring any individual claims.  The court, concluding that "the interest of the class members in maintaining separate actions" is small, concludes that this factor weighs in favor of finding superiority.  In re Nassau Cnty., 461 F.3d at 230.

Nor do the remaining factors weight against a finding of superiority.  For the second factor, the court is not aware of any other litigation pending concerning the present controversy.  Third, the court is not concerned about "concentrating the litigation of the claims in the particular forum," because all of the warehouses at issue are located in this District.  Finally, although this is a class involving more than 1,000 possible members, there is nothing to indicate to the court that this action is less manageable than another complex case under the Teamsters two-phase framework.

Thus, the court concludes that both requirements of Rule 23(b)(3) are satisfied, and the class can be certified pursuant to that subsection.  Because the court grants certification of the class pursuant to Rule 23(b)(3), the court views as moot the plaintiffs' alternative request for issue certification pursuant to Rule 23(c)(4).

D.    Modifications to the Class Definition

The plaintiffs defined their class as follows:

"All Black employees who worked within Bozzuto's wholesale operations in Connecticut between November 21, 2018 and the date of class certification."

Pl.'s Mot. at 3, Transcript at 8:10-9:11.  However, "[a] court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly."  Robidoux, 987 F.2d at 937; see also 5 Moore's Federal Practice § 23.21 (3d ed. 2017) (the

court "has broad discretion to modify the class definition as appropriate").  The court exercises that discretion here.

First, as the court explained above, the plaintiffs' disparate impact and disparate treatment claims can only satisfy commonality when the class definition is limited to hourly, warehouse associates.  See supra at 26-28; 40-41.  The class to be certified is properly constituted, therefore, of black, current and former Bozzuto's warehouse associates during the class period. The court modifies the class definition to:

> "All black, hourly warehouse associates employed in Bozzuto's warehouses, who have held the titles or positions of selector, forklift operator, checker, loader, clerk, slotter, support associate, cleaner, pallet auditor, wrapper, runner, between November 21, 2018 and the date of class certification."

See Vaughan Decl. at F.n. 1 (listing warehouse associate job titles); Lang Report at App. A (listing job titles).  If the record develops that other job titles are properly classified as warehouse associate positions, or if any of the job titles listed above are not hourly warehouse positions, the court may amend the class definition.

The court certifies the class on the foregoing definition pursuant to Rule 23(b)(3), reserving the right to modify the class definition prior to final judgment.

E.    Rule 23(g) Appointment of Class Counsel

Rule 23(c)(1)(B) requires a court certifying a class to appoint class counsel.  Rule 23(g)(1)(A) requires a court to consider: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3)

"counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A).  As the court discussed above, the court is satisfied with the representation provided by Attorneys Daniel Kotchen, Lindsey Grunert, and the firm Kotchen & Low LLP.  The court appoints Attorney Egbarin as local counsel, and Attorneys Kotchen, Grunert, and Kotchen & Low LLP as class counsel.

## V.    CONCLUSION

For the foregoing reasons, the Motion for Class Certification (Doc. No. 87) is granted in part and denied in part.  The court finds that Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy, as well as the implied requirement of ascertainability, are satisfied with respect to a class of hourly warehouse associates, but only for certain of the plaintiffs' claims.  With respect to the plaintiffs' disparate impact claims, the Motion is granted with respect to the claims as they apply to the six-month performance review system and Bozzuto's Bid Policy.  The Motion is denied with respect to the plaintiffs' disparate impact claims as they apply to promotion policies. With respect to the plaintiffs' disparate treatment claims, the Motion is granted, again only with respect to a class of hourly warehouse associates.  With respect to plaintiffs' hostile work environment claims, the Motion is denied.

The court finds that, with regard to a class of hourly warehouse associates, common questions predominate over individual ones, and that a class action is superior to other methods of adjudicating the controversy on the plaintiffs' disparate impact and disparate treatment claims. Pursuant to Rule 23(b)(3), the court certifies the foregoing claims with respect to a class of hourly warehouse associates.  The court exercises its

discretion to modify the class definition to the following:

> "All black, hourly warehouse associates employed in Bozzuto's
> warehouses, who have held the titles or positions of selector, forklift
> operator, checker, loader, clerk, slotter, support associate, cleaner, pallet
> auditor, wrapper, runner, between November 21, 2018 and the date of
> class certification."

Daniel Kotchen, Lindsey Grunert, and Kotchen & Low LLP are appointed class counsel

on behalf of the revised class, with Nitor Egbarin serving as local counsel.  In light of the

date of this Ruling, the court sets the deadline for dispositive motions to be filed to

March 21, 2025.

**SO ORDERED.**

Dated at New Haven, Connecticut this 21th day of February 2025.

   /s/ Janet C. Hall
Janet C. Hall
United States District Judge