**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| DONRUDY LOISEAU, *et al.*, | : | CIVIL CASE NO. |
| Plaintiffs, | : | 3:22-cv-01485 (JCH) |
| | : | |
| | : | |
| v. | : | |
| | : | |
| BOZZUTO'S INC., *et al.*, | : | NOVEMBER 25, 2025 |
| Defendants. | : | |

**RULING ON MOTION FOR SUMMARY JUDGMENT (DOC. NO. 166)**

## I.    INTRODUCTION

Plaintiffs Donrudy Loiseau ("Mr. Loiseau"), Quinton L. Hebron ("Mr. Hebron"),

and Dwayne Small ("Mr. Small") (together, "the plaintiffs"), bring this individual and class

action suit against their former employer, Bozzuto's Inc. ("Bozzuto's"), and former

supervisors, James Jones ("Mr. Jones"), Chuck Cerreta ("Mr. Cerreta"), and Joel

Santiago ("Mr. Santiago") (together, "the defendants").  See Second Amended

Complaint ("Am. Compl.") (Doc. No. 49).  The plaintiffs bring claims under section 1981

of Title 42 of the U.S. Code ("section 1981"), as well as Title VII of the Civil Rights Act,

section 2000 of Title 42, et seq. ("Title VII"), alleging that the defendants discriminated

against black employees with respect to promotions, warehouse position assignments,

pay, workplace discipline, and terminations.  See id.  The plaintiffs also allege that the

defendants created a hostile work environment for black employees.  See id.  Mr.

Loiseau also brings claims against Bozzuto's, Mr. Jones, and Mr. Cerreta alleging

retaliation against black employees. See id.

Before the court is the defendants' Motion for Summary Judgment on the

individual claims of Mr. Loiseau, Mr. Hebron, and Mr. Small.  See Defendants' Motion

for Summary Judgment ("Defendants' Motion") (Doc. No. 166); Memorandum in Support

("Defs' Mem.") (Doc. No. 166-1).  Defendants assert, inter alia, that there exists no material issue of fact that (1) plaintiffs cannot show disparate impact; (2) plaintiffs cannot establish that they suffered an adverse employment action in establishing disparate treatment; (3) plaintiffs cannot demonstrate conduct qualifying as severe or pervasive for purposes of proving a hostile work environment claim; (4) Mr. Loiseau cannot establish a retaliation claim nor meet the burden of a constructive discharge claim; and (5) plaintiffs cannot show evidence of malice or reckless intent in seeking punitive damages.  See Defendants' Motion at 1-2.

Plaintiffs challenge the Motion both on its merits and as procedurally defective. See generally, Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Opposition") (Doc. No. 174).  Notably, plaintiffs challenge the Motion as procedurally premature because this court has yet to determine liability as to the pattern-or-practice disparate impact and disparate treatment claims, which govern class-wide liability and would potentially afford plaintiffs a presumption of discriminatory wrongdoing in prosecuting their individual disparate impact and treatment claims.  Opposition at 10-14. Plaintiffs concede that summary judgment is appropriate, however, for those individual claims not subject to class treatment (e.g., hostile work environment).  Opposition at 1.

Plaintiffs argue in the alternative that, even if the Motion is not premature in seeking summary judgment on the individual claims subject to class treatment, it nevertheless fails on the merits.  See generally, id. at 14-40.

For the reasons stated below, the court denies the Motion.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  <u>Factual Background</u>

#### 1.  Bozzuto's Company Overview & Policies

Bozzuto's is a wholesale distributor of food and household products based in Connecticut.  <u>See</u> Plaintiffs' Local Rule 56(a)(2) Statement of Facts in Opposition to Summary Judgment ("Rule 56(a)(2) Stat.") at ¶ 8.  Bozzuto's maintains a facility in North Haven, Connecticut with four additional locations in Cheshire, Connecticut.  <u>Id</u>.  In its warehouse facilities, Bozzuto's employs workers in a variety of hourly positions, including "selector," "forklift operator," "checker," "loader," "wrapper," "clerk," "pallet auditor," among others.  <u>See</u> Ruling on Motion to Certify Class ("Class Cert Ruling") at 5.

As of 2022, Black and Hispanic employees comprised approximately 49% of Bozzuto's total workforce combined.  <u>See</u> Plaintiffs' Exhibit D ("Plfs' Exh. D"), EEOC 2022 Employer Information Report.  White employees comprise 92.5% of all Executive and Senior Level positions.  <u>Id</u>.

Bozzuto's maintains an Anti-Harassment Policy that does not permit any form of harassment on the basis of race, gender, color, religion, age, national origin, ethnicity, disability, veteran or military status, sex, orientation, marital status, or any other legally protected status.  Rule 56(a)(2) Stat. at ¶ 11.  The Anti-Harassment Policy outlines a formal complaint procedure, though the parties dispute whether all complaints brought thereunder are investigated.  <u>Id</u>. at ¶ 12.

Bozzuto's also maintains an Hourly Attendance and Reward Policy for hourly warehouse employees. The policy provides that employees are issued "attendance points" for any non-excused absences or "no call / no show" absences. Id. at ¶ 52.

Bozzuto's has an Hourly Bid Policy and Procedure ("Bid Policy") which applies to the movement of warehouse employees from one position to another.[1] Id. at ¶ 18. Pursuant to the Bid Policy, Bozzuto's publishes open warehouse positions in a public bulletin located at each Connecticut facility, allowing warehouse employees access to the postings for a period of eight days. Id. The Bid Policy provides that associates interested in an open position must contact the Bid Hotline and provide their full name, associate number, and Bid ID number for the position they're seeking. Id. at ¶ 19.

The Bid Policy provides that, for an employee to qualify for an open position, they must (1) be working in a full time or part time Warehouse production or support position for a minimum of six months; (2) be able to fulfill the essential functions of the job being bid for; (3) for Forklift and Loader bid positions specifically, have been in a prior Selector position for a minimum of six months; (4) not have nine or more attendance points; and (5) not have three or more active safety points. Id. at ¶ 20. The Bid Policy states that where there are two or more candidates with equal qualifications, "the candidate with the most time with Bozzuto's Inc. will be offered the position." Id. at ¶ 21.

Conversely, Bozzuto's posts open salaried management positions online on Bozzuto's internal human resources system, Bozzuto's website, and external job

---

[1] Employees in warehouse positions may be staffed in other warehouse roles outside of the bid process. See, e.g., Plfs' Exh. K, Loiseau Dep. Tr. 90:23-92:17 indicating that Mr. Loiseau transferred from Selector to Product Integrity Clerk outside of the bid process.

boards.[2]  Id. at ¶ 23.  Bozzuto's also posts open Warehouse Selector roles on external

job websites whereby external candidates may choose to apply to those Selector

positions.  Id. at ¶ 24.

>    2.   Individual Plaintiffs' Employment at Bozzuto's

>         a.   Mr. Loiseau

Mr.  Loiseau was hired on May 11, 2020, and worked for Bozzuto's for 14 months

in the following positions: (1) Selector; (2) Product Integrity Clerk; and (3) Quality

Control Clerk.  Id. at ¶ 25.  Mr. Loiseau's employment ended on July 9, 2021, while he

was employed as a Quality Control Clerk.  Id.  The parties contest whether Mr. Loiseau

resigned voluntarily or was constructively discharged.  Id.

 In his role as Selector, Mr. Loiseau expressed concern about not being quick

enough and feeling as though he may be fired as a result.  Plfs' Exh. K at 90:10-91:1.

Thereafter, Mr. Jones offered Loiseau a position as a Product Integrity Clerk.  Rule

56(a)(2) Stat. at ¶ 27.[3]  Mr. Loiseau accepted the offer and began work as a Product

Integrity Clerk on August 2, 2020, working under Mr. Cerreta.  Id. at ¶ 28.  Mr. Cerreta

gave Mr. Loiseau "highly satisfactory" performance reviews and increased his pay.  Id.

at ¶ 29.

---

[2] The parties contest whether all salaried management positions are posted electronically and whether, consequently, Bozzuto's employees can apply to all salaried roles.  See Rule 56(a)(2) Stat. at ¶ 23.  For purposes of the factual background and in the context of summary judgment where this issue of fact is not controlling, the court will proceed under the premise that salaried positions are posted electronically on the three platforms listed above: (1) the HR system; (2) the Bozzuto's website; and (3) external job posting sites by default but, as with the bid process and warehouse positions, certain salaried positions are filled outside of this process.

[3] The parties dispute whether Mr. Loiseau was offered the Product Integrity Clerk position as an alternative to termination.  Rule 56(a)(2) Stat. at ¶ 27.  The court declines to express a view on why Mr. Loiseau was offered the position, accepting only as fact that he was indeed offered the position by Mr. Jones.

On December 2, 2020, Mr. Loiseau bid for two open Forklift/Selector positions. Defendants' Exhibit ("Defs.' Exh.") 14. On December 9, 2020, Bozzuto's posted a list of all employees who had bid for the two open Forklift/Selector positions on the employee bulletin in North Haven, which posting indicated that Mr. Loiseau was "Not Eligible" for the position. Id. Later that same month, Mr. Loiseau was asked if he still wanted the Forklift position after it had yet to be filled. Rule 56(a)(2) Stat. at ¶ 32. Mr. Loiseau turned the position down. Id.

In February 2021, Mr. Loiseau began work as a Quality Control Clerk, in which he received a pay raise to $16.50 an hour. Id. at ¶ 33. In this role, Mr. Loiseau could use a "PC cart," which is a mobile computer workstation, to carry out his responsibilities. Id. at ¶ 34. Quality Control Clerks share PC carts with Inventory Clerks. Id. at ¶ 35.[4] Mr. Loiseau was trained to use a forklift and could use a forklift to carry out his responsibilities as a Quality Control clerk when Inventory Clerks were using the PC carts. Id. at ¶ 36. Loiseau was "upset," that he was "unable to use a PC cart at certain times," in his role as a Quality Control clerk. Id. at ¶ 37. On June 18, 2021, Mr. Loiseau emailed Mr. Cerreta, "We need more PC cart in the facility[.] Every day, I have to share my Cart with inventory." Id.

On June 18, 2021, Mr. Loiseau complained to Mr. Santiago of an incident involving Matthew Voloshin. Defs' Exh. 12 at 199:10-16. Mr. Voloshin was a co-worker with Mr. Loiseau, and Mr. Loiseau alleged that Mr. Voloshin called Mr. Loiseau a

---

[4] The parties dispute whether Inventory Clerks receive priority in using PC carts over Quality Control Clerks. Rule 56(a)(2) Stat. at ¶ 35. The parties agree, however, that both positions used the PC carts.

"fucking [n-word],"[5] and spit on his forklift after Mr. Voloshin's center rider clipped the pallet on Mr. Loiseau's forklift. Id. at 197:18-198:19; Defs.' Exh. 20. Mr. Santiago asked Mr. Loiseau to help locate Mr. Voloshin following the incident. Rule 56(a)(2) Stat. at ¶ 41. That same day, Mr. Santiago drafted an email to HR Manager Christine Rindos reporting the incident. Defs.' Exh. 19. On June 22, 2021, Ms. Rindos interviewed Mr. Loiseau regarding the issue with both Mr. Santiago and Mr. Jones present. Rule 56(a)(2) Stat. at ¶ 44. Following the meeting that same day, Ms. Rindos interviewed Mr. Voloshin. Id. at ¶ 45. Mr. Loiseau was not present. Ms. Rindos, Mr. Jones, Mr. Santiago, and Mr. Cerreta reviewed the security footage of the June 18, 2021 incident. Id. at ¶ 46. The footage reviewed did not contain audio. Id. Following its investigation, HR had confirmed that a verbal altercation transpired. Id. at ¶ 47.

Prior to the alleged incident, Mr. Loiseau had no previous interactions with Mr. Voloshin and no prior complaints involving him. Id. at ¶ 48. Following the incident, Mr. Loiseau made no request to be separated from Mr. Voloshin nor complain that he felt uncomfortable continuing to work with Mr. Voloshin. Id. at ¶ 49.

On July 5, 2021, Mr. Loiseau left work early without telling a supervisor on duty. Rule 56(a)(2) Stat. at ¶ 50.[6] Three days later, on July 8, Mr. Loiseau did not report to

---

[5] The court makes clear that the allegations at issue concern use of the full, actual racial epithet that "n-word" represents. The court uses the euphemistic placeholder so as to not repeat such harmful language in its Ruling.

[6] Defendants' Exhibit 13 shows correspondence between Mr. Cerreta and Mr. Loiseau in which Mr. Cerreta asks Mr. Loiseau if he left early and if so, had he done so without notifying the supervisor on duty. Specifically, Mr. Cerreta writes: "Which supervisor here did you tell that you were leaving. You can not just leave and not tell the supervisor on duty." See Defs.' Exh. 13 at 00211. No response by Mr. Loiseau is in the record.

In their Rule 56(a)(2) statement, plaintiffs challenge the statement of fact that Mr. Loiseau left work without telling anyone on the basis that Exhibit 13 does not substantiate the fact. The court agrees that Exhibit 13 does not substantiate the fact. Plaintiffs "otherwise admit[ ]" the fact. See Rule 56(a)(2) Stat. at ¶ 50. The court does not reach the question of whether the lack of response from Mr. Loiseau,

work for a doctor's appointment.  Id. at ¶ 51; Defs.' Exh. 12 at 190:9-191:12. Mr.

Loiseau called the hotline the night before but did not otherwise report the absence in

advance to a supervisor.  Id.  When he reported to work the next day, Mr. Cerreta

issued Mr. Loiseau a corrective review for his July 8 absence but later withdrew it after

Mr. Loiseau showed Mr. Cerreta evidence that he called the hotline regarding the

absence.  Id. at ¶ 54.  Between March 1, 2021, and July 8, 2021, Mr. Loiseau had 6.5

accumulated attendance points on his record.  Defs.' Exh. 24.

On July 9, 2021, Mr. Loiseau resigned from Bozzuto's.  Defs.' Exh. 12 at 196:8-

15.[7]  No one at Bozzuto's asked Mr. Loiseau to resign or told Mr. Loiseau that he had to

resign.  Id. at 196:16-21.  No one at Bozzuto's told Mr. Loiseau that he would be fired if

he did not resign.  Id. at 196:22-24.

On August 11, 2021, Mr. Loiseau filed his Complaint against Bozzuto's with the

State of Connecticut's Commission on Human Rights and Opportunities ("CHRO").

Defs.' Exh. 25.  Mr. Loiseau's CHRO Complaint alleged, inter alia, that he was

constructively discharged as a result of discrimination on the basis of his race, national

origin, and mental disability.  Id.  The CHRO dismissed Mr. Loiseau's Complaint on

August 10, 2022.  Defs.' Exh. 27.[8]

---

without more, substantiates the fact that he left work early without notifying a supervisor.  The court
otherwise draws this fact based on plaintiffs' admission.

[7] The parties dispute whether Mr. Loiseau's resignation was a constructive discharge.  Rule
56(a)(2) Stat. at ¶ 55.  The court recounts his resignation here not as a conclusion as to whether this
resignation was legally a constructive discharge, but only for purposes of sketching the formal end of Mr.
Loiseau's employment at Bozzuto's which came in the form of a resignation.

[8] Plaintiffs challenge defendants' Exhibit 27 as inadmissible under both Fed. R. Evid. 801 and
403.  Rule 56(a)(2) Stat. at ¶ 58.  The court does not use Exhibit 27 to prove the truth of the matter stated
therein, that there was no reasonable cause to believe Mr. Loiseau was discriminated against but rather
only to show that the CHRO ultimately dismissed the complaint on the date stated.

b. Mr. Hebron

Mr. Hebron was hired on May 11, 2017, and worked in North Haven in warehouse production, initially as a Selector, then as a Clerk, and ultimately as a Forklift Operator through the end of his first tenure at Bozzuto's on March 11, 2020.  Rule 56(a)(2) Stat. at ¶ 59.  Bozzuto's rehired Mr. Hebron as a Forklift Operator on September 20, 2020, and he held that position until the end of his second and final tenure at Bozzuto's on August 9, 2021.  Id. at ¶ 60.

Throughout Mr. Hebron's employment with Bozzuto's, he received multiple corrective reviews and warnings for issues related to attendance, safety, and meeting production standards.  Id. at ¶ 61.  However, Bozzuto's did not terminate Mr. Hebron for attendance issues, safety issues, or failure to meet production standards.  Id. at ¶ 62.

Mr. Hebron states that Mr. Jones and Mr. Cerreta did not discriminate against Mr. Hebron on the basis of his race or color.  Id. at ¶ 68.  Mr. Hebron never filed an internal complaint of discrimination during his employment at Bozzuto's nor did he file a complaint with the CHRO or EEOC prior to joining the instant action.  Id. at ¶ 69.  In the instant action, Mr. Hebron alleges disparate treatment in violation of section 1981, see Count One in Complaint, hostile work environment in violation of section 1981, see Count Two in Complaint, and disparate treatment in violation of Title VII, see Count Four in Complaint.

---

With respect to the challenge under Fed. R. Evid. 403, the court does not believe the probative value of Exhibit 27 is outweighed by possible prejudice or confusion.  It is germane to the factual record that Mr. Loiseau pursued his discrimination claims before the State of Connecticut, and that such claims were ultimately dismissed administratively.

c. Mr. Small

Mr. Small worked in warehouse production in the Bozzuto's North Haven facility from January 22, 2018, to August 12, 2022, starting first as a Selector and finishing his employment at Bozzuto's as a Production Integrity Clerk. Id. at ¶ 70. Mr. Small never applied for any positions at Bozzuto's other than the ones he held and never utilized Bozzuto's bid process. Id. at ¶ 72.

Mr. Small knew that he was entitled to take a 15-minute paid break and 30-minute unpaid lunch break when he worked as a Product Integrity Clerk in the fridge room (a cold storage facility). Id. at ¶ 73. Mr. Small does not claim he was discriminated against because of his race by being asked to work in the fridge room or by only being allowed to take one paid break while working in there. Id. at ¶ 74. During his tenure, Mr. Small was disciplined twice for taking extended unauthorized breaks. Defs.' Exh. 38 at 0529, 0535. In performance reviews, supervisors remarked that Mr. Small "has been written up for taking extended and unauthorized breaks" and that Mr. Small's "only issue has been at times that supervision needs to question his whereabouts." Defs.' Exh. 36 at 22-23.

On August 9, 2022, Kevin Gause, Bozzuto's Director of Operations for North Haven, who is Black, recommended Mr. Small be terminated for theft of time, and Mr. Small was subsequently fired. Rule 56(a)(2) Stat. at ¶ 77.

B. Procedural Background

Given the procedural complexity of the class action component of the instant action, the court sketches only the procedural history as relevant to the present Motion. On March 21, 2025, defendants filed their Motion for Summary Judgment on plaintiffs'

10

individual claims. (Doc. No. 166).  Defendants allege they are entitled to summary judgment on the individual claims, as alleged in plaintiffs' Second Amended Complaint (Doc. No. 49), as they relate to the plaintiffs in their individual capacity.  Plaintiffs filed their Opposition to defendants' Motion for Summary Judgment on April 11, 2025.  See Opposition.  Defendants submitted their Reply to plaintiffs' Opposition on April 25, 2025. See Defendants' Reply in Support of their Motion for Summary Judgment ("Reply") (Doc. No. 178).

## III.    LEGAL STANDARD

A motion for summary judgment may be granted only when the moving party can establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71-72 (2d Cir. 2016).  If the moving party satisfies this burden, the nonmoving party must set forth specific facts demonstrating that there is indeed "a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A genuine issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Cross Com. Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016). Unsupported allegations do not create a material issue of fact and cannot overcome a properly supported motion for summary judgment.  See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought."  LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

IV.    **DISCUSSION**

A.    <u>Disparate Impact & Treatment Claims</u>

Defendants first seek summary judgment on plaintiffs' disparate impact and disparate treatment claims, which this court certified for class treatment in its Ruling on Motion to Certify Class (Doc. No. 162, Doc. No. 188).  Defendants allege that, with respect to disparate impact, there is no issue of material fact: plaintiffs cannot show a disparate impact in promotion, job movement, or pay.  Defendants' Motion at 10-19.  In addition, with respect to plaintiffs' disparate treatment claims, defendants assert no material issue of fact exists that plaintiffs did not suffer an adverse employment action. <u>Id</u>. 19-27.

Plaintiffs argue at the outset that these claims are not amenable to summary judgment disposition because pattern-or-practice liability has not been determined in a Phase One liability trial, as provided under the <u>Teamsters'</u> framework governing class action liability.  Opposition at 1.  Plaintiffs argue, relatedly, that even if summary judgment were not procedurally premature, these claims should not be evaluated under the individual claim, burden-shifting frameworks advanced by defendants, but rather the framework available to class action plaintiffs under <u>Teamsters</u>.  The court agrees.

Ordinarily, a court analyzes a Title VII individual disparate impact claim under a three-part burden shifting framework.  <u>Mandala v. NTT Data, Inc.</u>, 975 F.3d 202, 207 (2d Cir. 2020).  The plaintiff "bears the individual burden of making a prima facie showing of disparate impact."  <u>Id</u>. (quoting <u>Gulino v. New York State Educ. Dep't</u>, 460 F.3d 361, 382 (2d Cir. 2006)).  "This requires the plaintiff to (1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish

a causal relationship between the two." Id. (quoting Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 151 (2d Cir. 2012)). Upon the prima facie showing, the defendant can rebut in one of two ways: (1) undermine the disparate impact or causal analysis, thereby ending the matter if successful, or (2) concede that a policy has a disparate impact but as job-related and consistent with business necessity. Id. at 208. If the defendant is successful in demonstrating business necessity, the burden returns to the plaintiff, who must show other methods exist to advance defendant's legitimate business interest without the undesirable racial effect. Id.

With respect to individual disparate treatment claims under Title VII, otherwise known as intentional discrimination claims, such claims are examined under the burden shifting framework of McDonnell Douglas. Ruiz v. Cnty. of Rockland, 609 F.3d 486, 491 (2d Cir. 2010). Under this framework, a plaintiff must make a prima facie showing that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse employment action took place under circumstances giving rise to an inference of discrimination. Id. Upon this showing, the burden then shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. Id. If successful, the burden shifts back to the plaintiff to show that the reason defendant proffered was pretextual. Id.

Theories of "pattern or practice" discrimination, however, proceed under a different order of proof. The phrase "pattern or practice" refers not to a separate, individual cause of action accruing under Title VII, but rather a burden-shifting framework the Supreme Court set out in International Brotherhood of Teamsters v. United States, 431 U.S. 324 (1977) (hereafter, "Teamsters") available to class action

plaintiffs when alleging discrimination under Title VII. Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 147 (2d Cir. 2012). Unlike in an individual disparate treatment or impact suit, a plaintiff's burden under the pattern-or-practice Teamsters framework requires only that the plaintiff prove the existence of a discriminatory policy rather than all elements of a prima facie case of discrimination. Id. at 149. As the Tenth Circuit explained, "[i]n a case involving individual claims of discrimination, the focus is on the reason(s) for the particular employment decisions at issue." Thiessen v. Gen. Elec. Cap. Corp., 267 F.3d 1095, 1106 (10th Cir. 2001). Pattern-or-practice cases, however, focus on patterns of discriminatory decision-making. Id.

Therefore, given the different focal point in pattern or practice cases, the allocation and order of proof is different. Id. "A pattern-or-practice lawsuit proceeds in two phases. First, during the 'liability phase,' the plaintiffs are required to establish a prima facie case of a policy, pattern, or practice of intentional discrimination against a protected group." Reynolds v. Barrett, 685 F.3d 193, 203 (2d Cir. 2012). The plaintiffs' burden is to show that unlawful discrimination has been a regular procedure or policy followed by the employer. Thiessen, 267 F.3d at 1106. In the liability stage, plaintiffs are not required to offer evidence that each person for whom they will seek relief was a victim of the discriminatory policy—just that such a policy existed. Id. The burden then shifts to the defendant to demonstrate that the plaintiffs' proof is either inaccurate or insignificant. Id. If the employer fails to do so, the finder of fact can conclude that a violation has occurred. Id. If the plaintiffs seek individual relief for the victims of the discriminatory practice or policy, the case moves into a subsequent stage where it is determined whether each individual plaintiff was a victim of the pattern or practice. Id.

14

In having prevailed in the first stage, the individual plaintiffs "reap a significant advantage for purposes of the second stage: they are entitled to a presumption that the employer had discriminated against them." Id. Indeed, as the Second Circuit recognized, the pattern or practice framework "substantially lessens each class member's evidentiary burden relative to that which would be required if the employee were proceeding separately with an individual disparate treatment claim under the McDonnell Douglas framework." Barrett, 685 F.3d 203-04 (2d Cir. 2012).

In the summary judgment context, individual claims for discrimination should not be assessed in standalone fashion when brought under a theory of pattern or practice discrimination. While the Tenth Circuit has acknowledged that "there is little case authority discussing summary judgment motions in pattern-or-practice cases," proper consideration of a motion for summary judgment in the context of pattern or practice claims requires analysis under the correct allocation of proof: the Teamsters framework, not the McDonnell Douglas framework. Id. at 1108-1109. Indeed, other courts have held similarly. See, e.g., Contreras v. Ridge, 305 F. Supp. 2d 126, 1365 (D.D.C. 2004) (finding defendants' argument that individual plaintiff's inability to establish a prima facie case under McDonnell Douglas "misses the mark" where such claims were brought on behalf of a class seeking class-wide relief for pattern and practice discrimination); Bryce v. Trace, Inc., 2008 WL 819494, at *8 (W.D. Okla. Mar. 25, 2008) (holding that where a pattern or practice claim is properly presented, an individual plaintiff's claim of discrimination is a second phase issue that must be preceded by proof of the existence of the discriminatory practice).

Defendants do not challenge plaintiffs' disparate impact and disparate treatment claims under the appropriate framework. Indeed, defendants state explicitly within the "Legal Standard" section of their Motion that "Plaintiff's claims for alleged violations of Title VII and 42 U.S.C. § 1981 are analyzed under the McDonnell Douglas burden-shifting framework." Defendants' Motion at 9. In examining the disparate impact and disparate treatment claims under <u>McDonnell</u> <u>Douglas</u>, defendants circumvent the theory of "pattern or practice" discrimination advanced by plaintiffs. In doing so, defendants potentially deprive plaintiffs of the presumption of discriminatory practice that would be relevant in the adjudication of Phase Two individual claims, and which would otherwise substantially lessen the burden plaintiffs bear in adjudicating their individual claims. <u>Reynolds</u>, 685 F.3d at 203-204. Stated differently: by forcing plaintiffs to establish discrimination under <u>McDonnell</u> <u>Douglas</u> at summary judgment, defendants are forcing plaintiffs to defend a theory of discrimination they do not aver. For that reason, the court denies summary judgment as to plaintiff's disparate impact and disparate treatment claims.

B.    <u>Hostile Work Environment Claims</u>

 Defendants next seek summary judgment on plaintiffs' individual hostile work environment claims. <u>See</u> Defs' Mem. at 27-33. To prevail on a hostile work environment claim under either section 1981 or Title VII,[9] a plaintiff must prove "(1) harassment that was sufficiently severe or pervasive to alter the conditions of her employment, creating an abusive working environment, and (2) a sufficient basis for

---

[9] Hostile work environment claims under Title VII and Section 1981 are governed by the same legal standard. <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 320 (2d Cir. 2015). Only Mr. Loiseau brings a hostile work environment claim under Title VII.

imputing the conduct that created the hostile environment to her employer." Ferris v.
Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001).

With respect to the first prong, what constitutes severe and pervasive is both
objective and subjective: "the conduct complained of must be severe or pervasive
enough that a reasonable person would find it hostile or abusive, and the victim must
subjectively perceive the work environment to be abusive." Littlejohn v. City of New
York, 795 F.3d 297, 321 (2d Cir. 2015). "When the workplace is permeated with
discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to
alter the conditions of the victim's employment and create an abusive working
environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). "Courts review the
totality of the circumstances, including the frequency of the discriminatory conduct; its
severity; whether it is physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with an employee's work
performance." McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 79 (2d Cir. 2010)
(internal citations omitted). "Although a continuing pattern of hostile or abusive behavior
is ordinarily required to establish a hostile environment, a single instance can suffice
when it is sufficiently egregious." Ferris, 277 F.3d at 136. "For racist comments, slurs,
and jokes to constitute a hostile work environment, there [generally] must be more than
a few isolated incidents of racial enmity." Schwapp v. Town of Avon, 118 F.3d 106, 110
(2d Cir.1997).

With respect to the second prong, there are two theories by which conduct can
be imputed to the employer. The first is strict vicarious liability where the supervisor
created the hostile work environment. Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 113

(2d Cir. 2015).  Second, through negligence whereby a co-worker, who is not a supervisor, created the hostile working conditions and the employer, upon learning of the conduct, fails to rectify it.  Bentley v. AutoZoners, LLC, 935 F.3d 76, 91-92 (2d Cir. 2019).

Against claims of a hostile work environment, an employer may invoke the Faragher/Ellerth affirmative defense whereby a defendant shows that: (1) the employer exercised reasonable care in preventing and promptly correcting the harassing behavior; and (2) the plaintiff unreasonably failed to avail themselves of any preventive or corrective opportunities by the employer or otherwise avoid the harm.  Ferraro v. Kellwood Co, 440 F.3d 96, 101 (2d Cir. 2006); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).  The employer may only raise the defense where one of two further elements is met: "either (1) the employee's supervisor took no 'tangible employment action,' which involves an official company act, against the employee; or (2) any tangible employment action taken against the employee was not part of the supervisor's discriminatory harassment." Ferraro, 440 F.3d at 101.

Defendants' arguments touch on both prongs of a hostile work environment claim, as well as the Faragher/Ellerth affirmative defense, across the three plaintiffs. The court turns to each plaintiff's claims in turn, beginning with Mr. Loiseau.

1.      Mr. Loiseau's Hostile Work Environment Claim

Mr. Loiseau's hostile work environment claim turns in part on the June 18, 2021 incident involving his co-worker Mr. Voloshin wherein Mr. Loiseau claims Mr. Voloshin spit on his forklift and called him a "fucking [n-word]."  See, supra, Part II.A.2.a.

Defendants assert that this "lone allegation of a discriminatory incident," which Bozzuto's HR thereafter investigated, is insufficient to show severe and pervasive conduct as required by a hostile work environment claim.  Defs.' Mem. at 28.  In addition, defendants assert that, along with Mr. Loiseau's failure to show severe and pervasive harassment, Mr. Loiseau has also failed to establish "that a specific basis exists for imputing the objectionable conduct to the employer."  Id. at 31-32.  Defendants point to their Anti-Harassment Policy, which they argue Mr. Loiseau invoked, as the "reasonable avenue for complaint," which shields Bozzuto's from liability for Mr. Voloshin's conduct.  Id. at 32.

With respect to defendants' first contention, the court evaluates whether a triable issue of fact exists as to whether a single incident can qualify as severe or pervasive.  Ordinarily, an isolated incident of harassment is insufficient to establish a hostile work environment claim unless extraordinarily severe.  Howley v. Town of Stratford, 217 F.3d 141, 153 (2d Cir. 2000).  However, there is no magic number of harassing episodes below which a plaintiff fails as a matter of law to state a claim.  Id. at 154.

Whether racial slurs constitute a hostile work environment turns in part on "the quantity, frequency, and severity of those slurs."  Schwapp v. Town of Avon, 118 F.3d 106, 111 (2d Cir. 1997) (quoting Vore v. Indiana Bell Tel. Co., 32 F.3d 1161, 1164 (7th Cir.1994)). The Second Circuit has found that, in the supervisor-subordinate context specifically, isolated use of the n-word does not foreclose a hostile work environment claim as a matter of law.  Daniel v. T & M Prot. Res., LLC, 689 F. App'x 1, 2 (2d Cir. 2017);  see also Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 24 (2d Cir. 2014) (stating in dicta that "no single act" can more quickly transform the nature of a

work environment than the use of the n-word by a supervisor).  The court declines to draw a sharp distinction between use of that term by a supervisor and use of that term by a colleague in determining the legal sufficiency of the conduct.

Mr. Loiseau, in his resignation email, wrote that he "felt afraid," and "sick to [his] stomach" after the alleged confrontation with Mr. Voloshin.  Plfs.' Exh. K.  He goes on to say that, following the Voloshin incident, he feels he is "walking on eggshells everyday" and does "not feel comfortable."  Id.  Isolated incidents must ordinarily be severe to form the basis of a hostile work environment claim.  A triable issue of fact exists as to whether being called the n-word, one of the most unambiguously racist and hideous words in the American English lexicon, constitutes sufficient severity to establish the existence of a hostile work environment.  This is especially so given the subjective physical and emotional response Mr. Loiseau experienced, where he alleges having felt fear, discomfort, and physical illness as a result of the episode.  Indeed, whether an incident is adequately severe to create an objectively hostile work environment and whether the plaintiff subjectively perceived it as hostile are ultimately questions for the factfinder.  Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 227 (2d Cir. 2004).

With respect to defendants' second contention, that Mr. Loiseau failed to establish that the defendants are liable through their own negligence for Mr. Voloshin's acts, the court also determines that there is a triable issue of fact.  Defendants are liable for Mr. Voloshin's conduct if they "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."  Dabney v. Christmas Tree Shops, 958 F.Supp.2d 439, 460 (S.D.N.Y.2013), (internal quotation marks omitted), aff'd sub nom Dabney v. Bed Bath & Beyond, 588 Fed.Appx. 15 (2d Cir.2014).  The relevant

inquiry is whether there was any reasonable avenue for complaint to report the harassing behavior.  Duch v. Jakubek, 588 F.3d 757, 762-63 (2d Cir. 2009).

The parties dispute whether the complaint procedure available at Bozzuto's was reasonable.  Plaintiffs contest that "the only avenue for reporting race-based misconduct by a White employee is to Bozzuto's predominantly White members of management and HR who frequently discount Black employees' complaints," see, e.g., Plfs.' Exh. L (indicating that Mr. Hebron believed there was "nobody to complain to" given that his concerns were about White managers) and, that even where Mr. Loiseau complained of Mr. Voloshin's conduct, Bozzuto's did not properly investigate or redress the incident. Opposition at 30.  During its investigation of the incident involving Mr. Voloshin, Bozzuto's did not interview Mr. Hebron, who allegedly witnessed the altercation. Defendants' Reply to Plaintiffs' Additional Material Facts at ¶ 26.  Defendants, on the other hand, point to the existence of the Anti-Harassment Policy and the underlying complaint procedure as evidence of the existence of a reasonable avenue for complaint. In light of the above, the adequacy of the existing avenue, including whether employees felt that their complaints would be properly heard and promptly (and adequately) investigated without fear of reprisal, remains a triable issue of fact, even given the existence of the Anti-Harassment Policy complaint procedure.  Mr. Loiseau's Hostile Work Environment claim survives summary judgment.

2.      Mr. Hebron's Hostile Work Environment Claim

Mr. Hebron alleges that racial comments and jokes were commonplace at Bozzuto's and were both used and condoned by management.  Opposition at 32.  See, e.g., Plfs' Exh. L at 224:16-225:16 (Mr. Hebron testifying that Mr. Jones discriminated

against other Black employees and that Mr. Hebron was personally discriminated against by his White supervisor); 163:2-165:21 (Mr. Hebron testifying, among other things, that Black employees were compared to apes during a work meeting). Mr. Hebron also asserts that these racial remarks contributed to a hostile work environment when viewed in tandem with other alleged acts of hostility Mr. Hebron experienced concerning pay, promotion, and other job interruptions. Opposition at 32-33. See, e.g., Plfs' Exh. L at 24:20-25:5 (Mr. Hebron testifying that his White supervisor would "purposely damage my percentage and my time" by taking Mr. Hebron's forklift away from him at random).

Defendants argue first that the conduct at issue is too isolated and sporadic to form the basis of a hostile work environment claim. See Defs' Mem. at 29. However, for reasons similar to those discussed with respect to Mr. Loiseau's claim, it remains a triable issue of fact whether the racist remarks and epithets Mr. Hebron witnessed are sufficiently severe as to constitute abusive working conditions. Contrary to defendants' contention that these incidents were sporadic or isolated, see Defs' Mem. at 30-31, Mr. Hebron's allegations suggest an overall culture at Bozzuto's where these remarks were commonplace and considered acceptable by supervisory staff and management. See, e.g., Plfs' Exh. L at 152:16 (Mr. Hebron testifying that his white Supervisor "always" made jokes about Black people). For that reason, the court declines to conclude as a matter of law that the conduct Mr. Hebron complains of fails to establish severe or pervasive harassment and reserves that determination for the factfinder as a triable issue of material fact.

Defendants' second contention turns on the Faragher/Ellerth defense. Defendants point to Bozzuto's anti-discrimination and harassment policies, and underlying complaint procedure, as a defense against liability for the conduct and comments of, among others, Mr. Hebron's supervisor.  Defs' Mem. at 32. As stated, an employer may invoke the Faragher/Ellerth affirmative defense when a defendant shows that: (1) the employer exercised reasonable care in preventing and promptly correcting the harassing behavior; and (2) the plaintiff unreasonably failed to avail themselves of any preventive or corrective opportunities by the employer or otherwise avoid the harm. Ferraro, 440 F.3d at 101.

As to the first element of the Faragher/Ellerth defense, Bozzuto's maintained a formal, written Anti-Harassment Policy with an underlying complaint procedure.  See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 103 (2d Cir. 2010).  As to the second element, defendants must prove that Mr. Hebron acted unreasonably in failing to avail himself of the Anti-Harassment complaint procedure.  Id.  However, a plaintiff does not act per se unreasonably in failing to avail themselves of a complaint procedure the plaintiff understands would be "ineffective or antagonistic."  Id. at 105.  Here, for example, Mr. Hebron testified that he believed Bozzuto's mishandled the incident with Mr. Loiseau and Mr. Voloshin, stating that Bozzuto's "blew [Mr. Loiseau] off.  So, if they blew is [sic] person off that got called the N word, what am I supposed to do?"  Plfs' Exh. L at 126:11-16.  A triable issue of fact exists as to whether it was unreasonable for Mr. Hebron to fail to invoke the complaint procedure to report incidents of harassment given his own understanding of the efficacy and hospitality of that avenue.  For that

reason, each of the defendants' <u>Farragher/Ellerth</u> defense fails and Mr. Hebron's hostile work environment claim survives summary judgment.

      3.      Mr. Small's Hostile Work Environment Claim

Mr. Small alleged, <u>inter alia</u>, that he was discriminated against by his supervisor, Mr. Santiago, who asked Mr. Small to complete assignments outside of his duties as a Selector. Oppn. at 33; Plfs.' Exh. M at 63:21-65:6. This impacted his ability to meet Bozzuto's production standards, resulting in corrective reviews that Mr. Small was forced to sign under threat of termination. <u>Id</u>. Mr. Small also alleged that he did not bid for a new Warehouse Floor positions and did not seek promotion to Supervisor or Manager, because he believed such efforts would be futile. Plfs' Exh. M at 155:10-14; 160:9-17 (Mr. Small stating that "I know what I know because I'm working there. I'm in the environment. I see things happen over and over.")

As with their challenge to Mr. Hebron's hostile workplace claim, defendants contest Mr. Small's claim on two grounds: (1) that the complained of conduct was not adequately severe or continuous to establish abusive working conditions and (2) Mr. Small did not avail himself to the complaint procedure available at Bozzuto's. <u>See</u> Defs.' Mem. at 29, 32-33. As with both Mr. Hebron and Mr. Loiseau, a triable issue of fact remains as to whether the incidents complained of, taken together, negatively alter the conditions of the workplace. Also, as with Mr. Hebron, a triable issue of fact remains whether Mr. Small, who already understood Bozzuto's as a workplace where reprisal and futility were features of the bid process and the corrective review process, could reasonably understand the complaint procedure to be ineffective or antagonistic. For that reason, Mr. Small's hostile workplace claim survives summary judgment.

C.    <u>Retaliation & Constructive Discharge</u>

Defendants next seek summary judgment on Mr. Loiseau's retaliation and constructive discharge claim.  <u>See</u> Defs' Mem. at 33-38.  To prevail on a retaliation claim under Title VII,[10] a plaintiff must prove: "(1) he was engaged in a protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  <u>Mitchell v. State Univ. of New York Upstate Med. Univ.</u>, 723 F. App'x 62, 63 (2d Cir. 2018) (quoting <u>Lore v. City of Syracuse</u>, 670 F.3d 127, 157 (2d Cir. 2012)).  "The plaintiff's burden in this regard is 'de minimis,'" as "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  <u>Hicks v. Baines</u>, 593 F.3d 159, 164 (2d Cir. 2010).  Actions are materially adverse where they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 57 (2006).

Constructive discharge occurs where "an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily."  <u>Chertkova v. Connecticut Gen. Life Ins. Co.</u>, 92 F.3d 81, 88 (2d Cir.1996).  "Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  <u>Id</u>.

---

[10] Retaliation claims brought under section 1981 are analyzed under the same standard as Title VII.  <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 315 (2d Cir. 2015).

The parties primarily contest the third element of Mr. Loiseau's retaliation claim: whether Mr. Loiseau suffered an adverse employment action following his complaint about Mr. Voloshin.  Namely, the parties challenge the scope of conduct properly examined as adverse and whether Mr. Loiseau's claim of constructive discharge is properly understood as an adverse employment action in response to his complaint about Mr. Voloshin.  See, e.g., Opposition at 36.

In their Opposition, plaintiffs argue that Bozzuto's retaliatory acts against Mr. Loiseau following his complaint "included bullying Loiseau, subjecting him to extreme pressure, giving him the silent treatment, speaking to him like a child, falsely accusing him of a no call/no show, and threatening him with suspension and termination." Opposition at 35; see, e.g., Plfs' Exh. H (Mr. Loiseau stating that he understood Management to be "upset" with him for contacting HR, that he feels he is "walking on eggshells," and that he was spoken to like a child).  Defendants allege that such conduct, even as alleged, does not amount to an adverse employment action.  See Defs' Mem. at 35-36.  Mr. Loiseau argues that the culmination of treatment he received following his complaint resulted in a constructive discharge, itself an adverse employment action.  Opposition at 36.  Defendants' rejoinder is that the environment Mr. Loiseau complains of was not so intolerable that a reasonable person would have felt compelled to quit.  Defs' Mem. at 38.

The court cannot conclude, as a matter of law, that the complained of acts taken together fail to constitute retaliation or constructive discharge.  Defendants examine each act—e.g., Mr. Loiseau receiving the proverbial silent treatment from coworkers, Mr. Loiseau's attendance warnings, etc., see Defs' Mem. at 35-36—in a vacuum,

alleging that no one act Mr. Loiseau describes is sufficient as an adverse employment action or sufficient to establish that a constructive discharge occurred. However, the proper inquiry is whether the conditions as a whole were so intolerable following Mr. Loiseau's complaint that they constitute an adverse employment action in and of themselves or resulted in the adverse employment action of constructive discharge. Indeed, Mr. Loiseau's resignation email describes the events as part of his general experience at Bozzuto's, not as a laundry list of discrete grievances.

Given the de minimis standard at the summary judgment stage in inferring retaliatory motive and the holistic view required to understand the climate of Mr. Loiseau's working conditions following his complaint, both Mr. Loiseau's retaliation claim, and his constructive discharge claim, are best suited for the fact finder. Therefore, the court denies summary judgment.

D.    Malice & Reckless Indifference

Finally, defendants challenge plaintiffs' prayer for punitive damages under Title VII and section 1981. Punitive damages are available under Title VII and section 1981 in "cases in which the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 529–30 (1999). "In an employment discrimination case, like this one, eligibility for punitive damages is characterized in terms of a defendant's motive or intent." Rivera v. W. Haven Smile Dental, LLC, 2019 WL 13295527, at *9 (D. Conn. May 30, 2019) (quoting Syrnik v. Polones Constr. Corp., 918 F. Supp. 2d 262, 264 (S.D.N.Y. 2013)). In seeking punitive damages, a plaintiff can show the necessary state of mind "with evidence (1) that the

defendant discriminated in the face of a perceived risk that its actions violated federal law, or (2) of egregious or outrageous acts that may serve as evidence supporting an inference of the requisite evil motive."  Id.  "An employer's retaliation against an employee who has complained of discrimination in the face of a perceived risk that its actions would violate federal law can itself support an award of punitive damages."  Id. at *10.  An employer can escape punitive liability by showing that it had an antidiscrimination policy and made a good faith effort to enforce it.  Lewis v. Am. Sugar Ref., Inc., 325 F. Supp. 3d 321, 359 (S.D.N.Y. 2018) (quoting Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 385 (2d Cir. 2001)).

Defendants assert both that the record shows no evidence that Bozzuto's conduct rose to the level of malice or reckless intent and that Bozzuto's maintains an anti-discrimination policy that it enforced in good faith.  Defs' Mem. at 39.  Material issues of fact exist as to both contentions.  First, Bozzuto's facially robust Anti-Harassment Policy indicates an understanding of the necessity of such policies in complying with state and federal antidiscrimination law.  Therefore, the alleged discrimination should be viewed against the backdrop of Bozzuto's as a sophisticated corporate employer.  To the extent it remains an issue of material fact that Bozzuto's discriminated against defendants, so too it remains an issue whether it did so knowing it ran the risk of violating federal law.

In addition, with respect to whether the Anti-Discrimination Policy shields defendants from punitive liability, there too exists a material issue of fact as to whether that policy was enforced in good faith.  Indeed, as the individual plaintiffs allege with respect to their own experiences and with respect to the pattern or practice allegations

animating the counts certified for class treatment, open questions remain whether Bozzuto's enforced its policies meaningfully.  Given these material issues of fact, summary judgment as to the punitive damages relief request is inappropriate.

**V.      CONCLUSION**

For the reasons stated above, the defendants' Motion for Summary Judgment (Doc. No. 166) is denied.

**SO ORDERED.**

Dated at New Haven, Connecticut this 25th day of November 2025.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge